Thomas E. LADNER, Appellant,

v.

The STATE of Texas, Appellee.

Billy Ray HORTON, Appellant,

v.

The STATE of Texas, Appellee.

James M. HYDEN, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 12–88–00193–CR to 12–88–00195–CR.

Court of Appeals of Texas, Tyler.

Aug. 31, 1988.

**672**

John H. Seale, Seale, Stover, Coffield & Gatlin, Jasper, for Ladner.

Jeff Haas, Tyler, for Horton.

Paul Buchanan, Beaumont, for Hyden.

Jack Skeen, Jr., Dist. Atty., Tyler, for appellee.

COLLEY, Justice.

This is an appeal by Thomas E. Ladner, Billy Ray Horton, and James M. Hyden (hereinafter referred to collectively as "appellants") from the trial court's order denying habeas corpus relief sought by appellants on double jeopardy grounds. We reverse and grant the relief sought.

On January 5, 1988, appellants were separately indicted by a Sabine County Grand Jury for violations of the civil rights of Loyal Garner, Jr., under the provisions of Tex.Penal Code Ann. § 39.021(a)(1) and (2) (Vernon Supp.1988) (hereinafter referred to as "section 39.021"). That section reads as follows:

> (a) A jailer or guard employed at a municipal or county jail, by the Texas Department of Corrections, or by a correctional facility authorized by Article 5115d, Revised Statutes, or Article 6166g–2, Revised Statutes, or a peace officer commits an offense if he:
>
> > (1) intentionally subjects a person in custody to bodily injury knowing his conduct is unlawful;
> >
> > (2) willfully denies or impedes a person in custody in the exercise or enjoyment of any right, privilege, or immunity knowing his conduct is unlawful.

The indictments in the Sabine cases were identical and read in pertinent part as follows:

> [T]hat [appellant], on or about the 25th day of December, A.D. 1987, and before the presentment of this indictment, in said County and State, did then and there as a peace officer, to-wit: Deputy Sheriff[1] of Sabine County, Texas, intentionally subject Loyal Garner, Jr., a person in custody, to bodily injury, to-wit: by hitting Loyal Garner, Jr. on his head and body with a slapstick and fists and causing Loyal Garner, Jr. to fall and strike his head against a wall and door; knowing his conduct was unlawful, and the death of Loyal Garner, Jr. occurred therefrom; .... [2]

A consolidated trial of the indictments was had before a jury in Sabine County. On July 15, 1988, the jury returned its verdict acquitting appellants on both counts of the indictments.

Meanwhile on March 3, 1988, appellants were separately indicted in Smith County

---

**1.** Both Horton and Hyden were alleged to be deputy sheriffs of Sabine County, Texas, and Ladner was alleged to be Chief of Police of the city of Hemphill, Texas.

**2.** A second count was alleged in each indictment, but that count is not pertinent here.

for the murder of Loyal Garner, Jr., who died in Smith County.[3]

On July 16, 1988, each appellant filed an application for writ of habeas corpus in the Smith County District Court seeking dismissal of the murder indictment against him on the ground that his prosecution for murder was barred by the Double Jeopardy Clause of the Fifth Amendment and Tex. Const. art. I § 14. The trial court denied relief, and appellants seek that relief in this court on appeal.

Omitting the formal portions, the Smith County murder indictments against the appellants read as follows, to-wit:

[T]hat on or about the 25th day of December, 1987, and anterior to the presentment of this Indictment, in the County and State aforesaid, [appellant] did then and there, intentionally and knowingly, cause the death of an individual, LOYAL GARNER, JR., by striking him about the head with a slapjack, and by striking him about the head with a night stick, and by striking him about the head with an object to the Grand Jury unknown;

AND THE GRAND JURORS AFORESAID, upon their oaths aforesaid, do further present in and to said Court that on or about the 25th day of December, 1987, and anterior to the presentment of this Indictment, in the County and State aforesaid, [appellant] did then and there, intending to cause serious bodily injury to an individual, to-wit: LOYAL GARNER, JR., intentionally and knowingly commit an act clearly dangerous to human life, to-wit: by striking the said LOYAL GARNER, JR., about the head with a slapjack, and by striking the said LOYAL GARNER, JR., about the head with a nightstick, and by striking the said LOYAL GARNER, JR., about the head with an object to the Grand Jury unknown, and thereby causing the death of LOYAL GARNER, JR.; . . .

The first paragraph of each Smith County indictment charges an offense under Tex.Penal Code Ann. § 19.02(a)(1) (Vernon 1974). The second paragraph charges an offense under section 19.02(a)(2). The pertinent parts of section 19.02 read as follows, to wit:

§ 19.02 Murder

(a) A person commits an offense if he:

(1) intentionally or knowingly causes the death of an individual;

(2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; . . . .

■ We now examine the constitutional law of double jeopardy as declared by the United States Supreme Court. In *Illinois v. Vitale*, 447 U.S. 410, 415, 416, 100 S.Ct. 2260, 2264, 2265, 65 L.Ed.2d 228 (1980), the Court stated: "The sole question before us is whether the offense of failing to reduce speed to avoid an accident is the 'same offense' for double jeopardy purposes as the manslaughter charges brought against Vitale." The Court noted that the rule developed for that analysis is provided by *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977); *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), and *Gavieres v. United States*, 220 U.S. 338, 31 S.Ct. 421, 55 L.Ed. 489 (1911), and may be stated as follows (quoting from *Blockburger* and *Brown*):

[T]he applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision [statute] requires proof of a fact which the other does not. 432 U.S. at 166, 97 S.Ct. at 2225.

*Vitale*, 447 U.S. at 416, 100 S.Ct. at 2265.

In *Vitale*, after observing that the Illinois Supreme Court failed to expressly state that proof of the manslaughter offense necessarily includes proof of a failure

---

**3.** *See* Tex.Code Crim.Proc.Ann. art. 13.07 (Vernon 1977), reading:

If a person receives an injury in one county and dies in another by reason of such injury, the offender may be prosecuted in the county where the injury was received or where the death occurred, or in the county where the dead body is found.

to reduce speed to avoid an accident or collision, the Court declined to hold that jeopardy barred the second prosecution (manslaughter), and stated that "[t]he mere possibility that the State will seek to rely on all of the ingredients necessarily included in the traffic offense to establish an element of its manslaughter case would not be sufficient to bar the latter prosecution." *Id.* at 419, 100 S.Ct. at 2266.

On the other hand, the *Vitale* court stated that "[i]f, as a matter of Illinois law, a careless failure to slow is always a necessary element of manslaughter by automobile, then the two offenses are the 'same' under *Blockburger* and Vitale's trial on the latter charge would constitute double jeopardy under *Brown v. Ohio*." *Id.* at 419, 420, 100 S.Ct. at 2266, 2267. The clear implication of *Vitale* is that upon trial of the manslaughter offense, if the State does in fact rely on the failure to reduce speed to establish the manslaughter offense, then any conviction therefor would be void under the jeopardy rule.

Here, the first question before this court is whether the alleged civil rights offense is the "same offense" as the murder charges brought against appellants. *Vitale*, 447 U.S. at 415–416, 100 S.Ct. at 2264–65. To determine that question, we must apply the *Blockburger* test.

In applying the test we must look at and compare the proof necessary to prove the statutory elements of murder under section 19.02(a)(1) and section 19.02(a)(2) with the elements of violation of civil rights under section 39.021(a)(1) rather than the evidence actually produced at the trial of the civil rights prosecution. However, *Vitale* also directs that we must analyze the penal statutes by focusing on the respective indictments. *Vitale*, 447 U.S. at 411–413, 100 S.Ct. at 2262–63.

In this case, the first count of the indictments against appellants in the civil rights case alleged that each appellant was a peace officer who intentionally subjected Garner, a prisoner in jail, to bodily injury by striking him "on his head and body with a slapstick and fists and [caused Garner] to fall and strike his head against a wall and door; knowing his conduct was unlawful, and the death of [Garner] occurred therefrom; ...."

The first paragraph of the murder indictments charges that the appellants "intentionally and knowingly" caused the death of Garner. That requirement is not present in the civil rights indictments. The second paragraph of the murder indictments charges that the appellants, "intending to cause *serious* bodily injury" (emphasis added) to Garner, struck him with a "slapjack" and a "nightstick" "thereby causing" his death. That requirement is not present in the civil rights indictments.

The first count in the civil rights indictments required the State to prove that the appellants were peace officers, and that Garner was "a person in custody" at the time of the injuries. These requirements of proof are not present in the murder indictments. The first count in the civil rights indictments also requires proof that the blows struck by appellants to Garner's head and body caused Garner "to fall and strike his head against a wall and door." Such proof is not required by the murder indictments. The civil rights indictments require proof that the appellants knew their conduct was unlawful at the time the blows were struck against Garner. That proof is not required by the murder indictments.

Thus, we conclude, under *Blockburger*, *Vitale*, and *May v. State*, 726 S.W.2d 573 (Tex.Cr.App.1987), that murder as alleged in the Smith County indictments is not "the same offense" as the violations of civil rights alleged in the first count of the Sabine County indictments.

■ Appellants also contend that their prosecution for the murder of Garner is barred by the application of the doctrine of collateral estoppel which the Court in *Ashe v. Swenson*, 397 U.S. 436, 442–446, 90 S.Ct. 1189, 1193–95, 25 L.Ed.2d 469 (1970), declared to be embodied in the Fifth Amendment guaranty of double jeopardy.

In *Ashe*, the Court defined "collateral estoppel" in the following language:

It means simply that when a [sic] issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. *Id.* at 443, 90 S.Ct. at 1194. The Court also stated "that the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." *Id.* at 444, 90 S.Ct. at 1194. The Court explained that:

> Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." The inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." *Sealfon v. United States*, 332 U.S. 575, 579, 68 S.Ct. 237, 240 [92 L.Ed. 180 (1948) ]. Any test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal.

*Id.* at 444, 90 S.Ct. at 1194.

The *Ashe* Court cited with approval a quotation from Mayers & Yarbrough, *Bis Vexari: New Trials and Successive Prosecutions*, 74 Harv.L.Rev. 1, 38–39, reading in part:

> If a later court is permitted to state that the jury may have disbelieved substantial and uncontradicted evidence of the prosecution on a point the defendant did not contest, the possible multiplicity of prosecutions is staggering.

*Ashe*, 397 U.S. at 444 n. 9, 90 S.Ct. at 1194, n. 9.

The record before the trial court and this court consists of transcripts in each case, containing, inter alia, each appellant's application for the writ, copies of the Sabine County and Smith County indictments, the Court's charge,[4] the jury verdict, and a statement of facts of the habeas corpus hearing conducted in Smith County on July 16, 1988.

The record reveals that the alleged beating of Garner in the Sabine County Jail constitutes the basis for the murder prosecutions. The State concedes that a "majority" of the witnesses who testified in the Sabine County cases will be called by the State to give testimony concerning "the same events, occurrences, circumstances" that such witnesses testified to in the Sabine County prosecutions. It is also undisputed that the court signed judgments of acquittal in the Sabine County cases.

Paul Buchanan, counsel for appellant Hyden, testified there was no dispute at the trial of the Sabine County cases that each appellant was a peace officer and Garner a person in custody at the time of the alleged commission of the civil rights offense, stating "[t]he primary issue being the hitting of [Garner] with a slapstick and especially the fact that his death was caused therefrom." Buchanan also testified that there was "no issue as to the fact that [Garner] had died but there was a significant issue as to the cause of death." On cross-examination Buchanan candidly admitted he could not testify as to "what the basis of the jury's verdict [was]." He further testified that the allegations that Ladner struck the blows "knowing his conduct was unlawful" was disputed. Buchanan also testified without dispute that each appellant testified in his own behalf in the Sabine County prosecutions, and that each admitted that he was a peace officer on the date of the alleged offense.

John Hannah, who acted as special prosecutor of the Sabine County indictments, testified at the habeas corpus hearing. Hannah stated that no "serious issue" was presented to the Sabine County jury as to whether appellants were "peace officers." Hannah, when asked whether he and de-

---

4. Under the charge, the criminal responsibility of Hyden and Horton was predicated on Lad-

ner's conduct pursuant to Tex.Penal Code Ann. § 7.02(a)(3) (Vernon 1974).

fense counsel "agreed [that Garner] ... was in fact a prisoner," stated that although that issue was submitted to the jury, "I don't think that the defense attempted to make that an issue."

Taking a reasonable and realistic view of the record before us, we conclude that the State in prosecution of the murder indictments must necessarily prove by the same witnesses who testified during the Sabine County prosecutions, that Ladner intentionally struck Garner thereby causing Garner's death. In addition, we deem it reasonable to conclude that each appellant will testify in his own defense in the murder prosecutions in Smith County. Furthermore, based on the record made at the habeas hearing, we are persuaded that upon trial of the civil rights action it was undisputed that appellants were peace officers and that the deceased was a prisoner at the time of the alleged attack on him. Eliminating these issues from our consideration, we are left with the following disputed fact issues [5] before the jury:

[I]f you find from the evidence beyond a reasonable doubt that on or about the 25th day of December, 1987, in Sabine County, Texas, the defendant, Thomas Ladner ... intentionally subjected [Garner] ... to bodily injury, to-wit: By striking him on the head with a slapstick, knowing his conduct was unlawful, and that the death of [Garner] occurred therefrom, and that the use of force was not justified by the instructions heretofore given in this charge, then you will find the defendant [Ladner] ... guilty of the charge of violations of civil rights of [Garner] ..., as alleged in Count One of the Indictment.

The instructions referred to in the above-quoted paragraph of the charge relate to the justification defense provided by Tex. Penal Code Ann. § 9.53 (Vernon Supp.1988)

**5.** As submitted by the court's charge respecting the first count of the civil rights indictment.

**6.** Section 9.53 reads:
A peace officer, jailer, or guard employed at a municipal or county jail, or a guard or correctional officer employed by the Texas Department of Corrections is justified in using force against a person in custody when and to the

(hereinafter referred to as "section 9.53") [6] and read as follows:

You are instructed that our law provides that a peace officer, jailer, or guard employed at a municipal or county jail, is justified in using force against a person in custody when and to the degree the peace officer, jailer, guard or correctional officer reasonably believes the force is necessary to maintain the security of the penal institution, the safety or security of other persons in custody, or employed by the penal institution, or his own safety or security.

Now, if you find from the evidence, or have a reasonable doubt thereof, that Thomas Ladner, as a peace officer or guard employed at a municipal or county jail, used such force against Loyal Garner, Jr. while he was in custody when and to the degree the peace officer, Thomas Ladner, reasonably believed that force was necessary to maintain the security of the penal institution, the safety or security of other persons in custody or employed by the penal institution, or his own safety or security, you will say not guilty by your verdict.

Thus under the record, the jury's acquittal is obviously grounded on one or more of the following disputed fact issues: whether (1) Ladner intentionally struck Garner, (2) knowing his conduct was unlawful, (3) Garner died as a result of the injuries; and (4) whether Ladner's conduct was justified under section 9.53. Each of these issues, other than the issue of whether Ladner knew his conduct in striking Garner, if he did, was unlawful, must be established or disproved by the State beyond a reasonable doubt in order to convict the appellants of murder as alleged in the Smith County indictments.

The question of whether Ladner acted "knowing his conduct was unlawful" is piv-

degree the peace officer, jailer, guard, or correctional officer reasonably believes the force is necessary to maintain the security of the penal institution, the safety or security of other persons in custody or employed by the penal institution, or his own safety or security.

otal because that issue was submitted to the Sabine County jury as an essential element of the civil rights offense. And it is the only disputed fact issue submitted in those cases that is not an essential element of murder as alleged in the Smith County indictments.

The jury was not given the statutory definition[7] of "unlawful," so we must assume that the jury in its deliberations utilized the meaning commonly ascribed to the word, viz., "not lawful: contrary to or prohibited by law: not authorized or justified by law: ... disobeying or disregarding the law...." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2502 (1976). The definition of the word is essentially the same in BLACK'S LAW DICTIONARY 1377 (5th ed. 1979); however, BLACK adds that the word unlawful, "[w]hile necessarily not implying the element of *criminality*, ... is broad enough to include it." (Emphasis ours.) Consequently, a realistic examination of the record, however meager and incomplete, employing as we must, reason and common sense, persuades us that reasonable lay jurors could not have predicated their acquittal in the civil rights prosecutions solely on the disputed factual issue of whether Ladner struck the blows against Garner "knowing his conduct was unlawful," given the profusion of instructions set forth in the charge respecting the justification defense.[8]

With that analysis, three disputed issues remain for consideration. They are: (1) Did Ladner intentionally strike the alleged blows against Garner; (2) Did those blows result in the death of Garner; and if so, (3) Was Ladner's conduct justified under section 9.53. It is obvious that the State must necessarily relitigate[9] all of these issues in order to convict appellants of murder under either paragraph set forth in the Smith County indictments. The doctrine of collateral estoppel prohibits the State from so doing, and that ingredient of double jeopardy protection prohibits prosecution of the Smith County indictments against the appellants. *Ashe v. Swenson*, 397 U.S. at 443–446, 90 S.Ct. at 1194–95.

■ Our opinion sufficiently answers the State's arguments in this case other than its arguments that (1) the legislature has authority, and is not precluded by the Fifth and Fourteenth Amendments from "[splitting] a single transaction into separate crimes ... [and providing] multiple punishments;" (2) section 39.021(c) authorizes dual prosecutions for the same conduct, and that jeopardy's protection under the Fifth and Fourteenth Amendments does not affect such legislative authority; and (3) appellants are estopped to claim jeopardy's protection because they "instigated or procured the first proceeding with the intent to preclude the full consequences of [their] criminal conduct."

7. Tex.Penal Code Ann. § 1.07(36) (Vernon 1974) provides:
   "Unlawful" means criminal or tortious or both and includes what would be criminal or tortious but for a defense not amounting to justification or privilege.

8. It is noteworthy that section 39.021 was first enacted by the 66th Legislature in 1979. (Act of June 13, 1979, ch. 618, § 1, 1979 Tex.Gen.Laws 1383). Subsection (a)(1) then read in part:
   A peace officer ... commits an offense if he: intentionally subjects a person in his custody to bodily injury *knowing his conduct is unlawful.* (Emphasis ours.)
   Although the section was later amended twice, in 1983, and again in 1987, no substantial change was made to the language under consideration. On the other hand, section 9.53 was *first* enacted in 1987. (Act of June 17, 1987, ch. 512, § 1, 1987 Tex.Gen.Laws 2124.) It appears

that the legislature, in the absence of a justification defense specifically applicable to the conduct proscribed by the 1979 version of section 39.021(a)(1), intended to criminalize assaultive conduct of a peace officer, jailer or guard in penal institutions towards a prisoner only when the officer's conduct was not justified under the facts and circumstances surrounding the conduct. Thus the term "knowing his conduct is unlawful" was inserted in the definition of the offense in 1979 in order to provide a justification defense not then separately provided. The enactment of section 9.53 appears to render the term vestigial and unnecessary.

9. Precisely, the State in order to discharge its burden of proof must prove the first two elements beyond a reasonable doubt, and disprove the justification defense beyond a reasonable doubt. *See* Tex.Penal Code Ann. §§ 2.01 and 2.03(a)(d) (Vernon 1974).

We reject the State's arguments one and two because it is clear that while the legislature may be free to create and define offenses as it chooses, the prosecutors and the courts are not free to prosecute and convict an accused contrary to jeopardy's first guarantee.[10] *Brown v. Ohio,* 432 U.S. at 165, 97 S.Ct. at 2225; *Ashe v. Swenson,* 397 U.S. at 445–446, 90 S.Ct. at 1195. It must be understood that this case is not one "[w]here consecutive sentences are imposed *at a single criminal trial* [and in which] the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." (Citations omitted.) *Brown v. Ohio,* 432 U.S. at 165, 97 S.Ct. at 2225. (Emphasis ours.)

■ The State's argument three is untenable for the reason that the record does not support it. There is no fraud or collusion shown between appellants and their accusers as contemplated by *Benard v. State,* 481 S.W.2d 427, 430 (Tex.Cr.App. 1972), and illustrated by the holding in *Richardson v. State,* 109 Tex.Crim.R. 403, 5 S.W.2d 141 (1928).

For the reasons stated, the judgment in trial court cause numbers 1–88–152, 1–88–153, and 1–88–154 on the docket of the 241st Judicial District Court of Smith County, Texas, are reversed and the indictments in those cases are dismissed, and it is so ORDERED.

---

**10.** Which protects against a second prosecution for the same offense after acquittal. *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969).