Thomas E. LADNER, et al.

v.

J.B. SMITH, et al.

Civ. A. No. B–90–0214–CA.

United States District Court,
E.D. Texas,
Beaumont Division.

April 12, 1990.

John H. Seale, Seale, Stover, Coffield, Gatlin & Bisbey, Jasper, Tex., for petitioners.

Jack Marion Skeen, Jr., Smith County Dist. Atty., Tyler, Tex., for respondents.

## MEMORANDUM AND ORDER ADOPTING THE MAGISTRATE'S REPORT AND OVERRULING MOVANTS' OBJECTIONS

COBB, District Judge.

Petitioner, Thomas E. Ladner, filed this petition for writ of habeas corpus under 28

U.S.C. § 2241[1], contending that a pending state prosecution for murder violates his Fifth Amendment guarantee against being twice placed in jeopardy. Petitioner also filed a motion for a temporary stay of pending state court criminal proceedings under 28 U.S.C. § 2251.

Billy Ray Horton and James M. Hyden, also charged in the murder prosecution, were added as petitioners in this cause when the court granted their motions to intervene.

Respondents are the 241st District Court of Smith County, Texas; Honorable Joe Tunnell, Judge of the 241st District Court of Smith County, Texas; Honorable Jim Mattox, Attorney General of the State of Texas; and Honorable J.B. Smith, Sheriff of Smith County, Texas.

The petitions were referred to the magistrate for review, evidentiary hearing if deemed necessary, submission of a report and recommendation for disposition, and determination of all other matters permissible for disposition by magistrates under 28 U.S.C. § 636(b)(1) and (3) (West Supp.1977).

The magistrate held an evidentiary hearing on the merits and issued his report and recommendations on an expedited schedule. The petitioners filed objections, and this court heard those objections and responses. This court now DENIES the petition for writ of habeas corpus and the motion for stay of state court proceedings.

### I.

### *State Court Proceedings*

On January 5, 1988, indictments were returned against petitioners in the 1st Judicial Court of Sabine County, Texas for the offense of violating the civil rights of a prisoner. Subsequently, on March 3, 1988, indictments were returned against petitioners in the 241st District Court of Smith County, Texas for the offense of murder. After a jury trial in Sabine County, peti-

---

**1.** Although petitioner originally filed his petition under 28 U.S.C. § 2254, the court deemed jurisdiction to be asserted under 28 U.S.C. § 2241.

*See* court's memorandum opinion and order of March 23, 1990.

tioners were acquitted on July 15, 1988 of the charges of violating the civil rights of a prisoner. Petitioners sought state habeas corpus relief to prevent further prosecution on the murder charges, scheduled to go to trial on the following Monday. The 241st District Court of Smith County held a hearing on the state petitions for writ of habeas corpus the day after the civil rights trial concluded and denied relief.

On appeal, the Twelfth Circuit Court of Appeals reversed the judgments of the district court and ordered the murder indictments dismissed. *Ladner v. State*, 790 S.W.2d 671 (Tex.App.1988). The appeals court concluded that the Double Jeopardy Clause of the Fifth Amendment collaterally estopped the pending murder prosecutions. The appeals court found three of the four issues litigated in the civil rights prosecution would necessarily be relitigated by the State in the murder prosecution. As to the fourth issue, whether Ladner acted "knowing his conduct was unlawful," the court held that a reasonable jury could not have predicated their acquittal in the civil rights prosecution on that issue, given the jury instructions in the case regarding the statutory defense of justification.

Upon granting the State's petition for discretionary review, the Texas Court of Criminal Appeals held that the intermediate court of appeals incorrectly applied the collateral estoppel doctrine. *Ladner v. State*, 780 S.W.2d 247 (Tex.Crim.App.1989) (en banc). The court stated that the statute establishing the civil rights offenses specifically requires the State to prove whether the defendant knew his conduct was unlawful, and the jury was so charged. Since the jury could have based its acquittal in the civil rights prosecution on a finding that the State failed to prove this element, collateral estoppel did not bar the murder prosecution because whether the defendant knew his conduct was unlawful is statutorily irrelevant in a murder prosecution.

## II.

### *Undisputed Threshold Issues*

To expedite consideration of this case on the merits prior to the scheduled trial of the Smith County murder cases, the magistrate entered a memorandum opinion and order on March 23, 1990, wherein preliminary determinations were made as to jurisdiction, venue, standing and exhaustion. None of the respondents has objected to these preliminary findings, and this court adopts them.

This court concludes that jurisdiction and venue are established; that petitioners have standing; that the issues are ripe for decision; and that the proper parties are before the court.

## III.

### *Governing Law*

The Fifth Amendment of the United States Constitution consists of a single sentence. The Double Jeopardy Clause of that amendment reads:

> "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb, ..."

Petitioners seek relief under this clause. The relief they seek is specifically covered by a single component of the clause—"collateral estoppel". The term, first developed in civil litigation, has been characterized by various courts as "awkward", "slippery" and "evanescent". It means simply that when an issue of ultimate fact once has been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).

In *Ashe*, the Supreme Court of the United States held that the Fifth Amendment guarantee against double jeopardy, applicable to individual State prosecutions through the Fourteenth Amendment, embodies collateral estoppel as a constitutional requirement. Thus, when a defendant is acquitted based upon insufficiency of the evidence, a second prosecution, even on a technically *different* charge, is prohibited if the second prosecution involves relitigation of an issue of ultimate fact which was determined adversely to the prosecution in

the first case. The court instructed federal courts in habeas corpus proceedings to apply this test:

> Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, our approach requires a court to examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.

*Id.* at page 444, 90 S.Ct. at 1194.

■ The test enunciated in *Ashe* involves two inquiries. *United States v. Mock*, 604 F.2d 341 (5th Cir.1979); *aff'd*, 640 F.2d 629 (5th Cir.1981). The first requires examination of what issues were truly present in the first prosecution. On this point, the *Ashe* court's position was clear. Reviewing courts are not to apply a hypertechnical or archaic approach, but are to proceed with realism and rationality. Thus, issues only technically in dispute are to be disregarded. The court must focus instead on what issues actually were litigated.

■ The second inquiry is whether a rational jury could have grounded its verdict upon an issue other than that which the habeas corpus petitioner seeks to foreclose on the basis of double jeopardy. Collateral estoppel is established only if the prior verdict of acquittal *necessarily* meant that the defendant could not have been guilty of the offense charged in the second prosecution. *Turner v. Arkansas*, 407 U.S. 366, 369–70, 92 S.Ct. 2096, 2098–99, 32 L.Ed.2d 798 (1972). The State is barred from relitigating only those issues which were necessarily resolved in favor of the defendant in the prior prosecution. *United States v. Gonzalez*, 548 F.2d 1185 (5th Cir.1977).

Petitioners and respondents agree concerning these general principles. This court also enjoys an advantage over the state trial and appellate courts which have previously wrestled with petitioners' double jeopardy claims in that all relevant portions of the state court records concerning the Sabine County civil rights trial have been produced for review. The petitioners' objections focus on the magistrate's interpretation of these principles. Accordingly, the only question before this court is whether, under the entire record, a rational jury could have grounded its verdict upon any issue other than that which the defendant seeks to foreclose from consideration in the pending Smith County murder case.

## IV.

### *Analysis*

A. Elements of the Various Charged Offenses

The court first must examine the elements of the offenses charged in each prosecution. The *Ashe* test permits the second prosecution if the former case ostensibly required proof of an element not required in the subsequent one. In the Sabine County indictment, petitioners were charged with violating the civil rights of a prisoner under two provisions of the Texas Penal Code, namely, Sections 39.021(a)(1) and 39.021(a)(2). The essential elements of these offenses are:

*Section 39.021(a)(1)*
1. a peace officer
2. intentionally
3. subjects a person in his custody
4. to bodily injury
5. knowing his conduct is unlawful.

*Section 39.021(a)(2)*
1. a peace officer
2. willfully denies or impedes a person in his custody
3. in the exercise or enjoyment of any right, privilege, or immunity
4. knowing his conduct is unlawful.

In the pending Smith County indictment, petitioners are charged with the offense of murder under two sections of the Texas Penal Code, namely, Sections 19.02(a)(1) and 19.02(a)(2). The essential elements of these offenses are:

*Sections 19.02(a)(1)*
1. a person
2. intentionally or knowingly
3. causes the death
4. of an individual.

**1258**

*Sections 19.02(a)(2)*

1. a person
2. intends to cause serious bodily injury and
3. commits an act clearly dangerous to human life
4. causes the death of an individual.

### B. The Competing Arguments

Clearly, the civil rights prosecution involved at least three essential elements not at issue in the pending murder cases. However, consistent with *Ashe*, it has been agreed by the parties that there was no real question at trial as to whether the defendants were peace officers and whether Loyal Garner, Jr., was in custody. Accordingly, the only essential element actually in dispute upon which the Sabine County jury could have based its verdict which would not bar the subsequent murder prosecution is the element of "knowing his conduct was unlawful." Predictably, respondents argue that the presence of this unique element in the Sabine County case defeats the petitioners' double jeopardy claim.

Petitioners' opposing argument is not readily apparent. Petitioners agree that the elements enumerated in the preceding section are correctly stated insofar as what the prosecution must allege and be prepared to prove. But petitioners argue further that in the Sabine County cases, the prosecution had an additional trial burden of disproving or negating beyond a reasonable doubt the defense of "justification" under Tex. Penal Code Ann. § 9.53.[2] Petitioners assert that the only issue on which a rational jury could have acquitted them in the Sabine County civil rights trial was the defense of justification. Petitioners fur-

ther assert (without contravention from respondents) that substantially the same justification defense inevitably will be raised in the Smith County murder case. Under petitioners' view, this issue necessarily has been previously and adversely determined against the State.

### C. On What Grounds Could a Rational Jury Have Acquitted?

■■■■■■ At the Sabine County civil rights trial, the jury clearly could have acquitted on the basis of the justification defense. Respondents have not contested petitioners' assertions that justification was their primary and strongest defense. This court, however, is not directed or permitted to ascertain what the Sabine County jury most likely thought. Instead, this court is charged with finding whether any rational jury *could* realistically have based its verdict upon any other element. And if a rational jury could have based its verdict upon some other element unique to the offense of violation of civil rights of a prisoner, the inquiry must end. In such event, the second prosecution for murder is not barred.

Petitioners have the burden to prove both that there are identical issues in the first and second prosecutions, and that in reaching their verdict of not guilty in the first trial, the jury necessarily resolved the identical contested issues of fact in their favor. It is crucial, therefore, for petitioners to demonstrate that the element unique to the civil rights prosecution—"knowing his conduct is unlawful"—could not have been the basis for their acquittal.

Petitioners' contentions are difficult to comprehend. They appear to make two arguments:

> A peace officer, jailer, or guard employed at a municipal or county jail, or a guard or correctional officer employed by the Texas Department of Corrections is justified in using force against a person in custody when and to the degree the peace officer, jailer, guard, or correctional officer reasonably believes the force is necessary to maintain the security of the penal institution, the safety or security of other persons in custody or employed by the penal institution, or his own safety or security.

---

**2.** Under the Texas system, exculpatory issues—usually of excuse or justification—involve a production-of-evidence burden on the defendant and a burden of persuasion on the prosecution. Thus, when evidence supporting the existence of a defense is admitted, the prosecutor is required to negate the existence of the defense by proof beyond a reasonable doubt. See Tex.Penal Code Ann. § 2.03 (Vernon's, 1974).

Tex.Penal Code Ann. § 9.53 (Vernon's Suppl. 1989) provides:

### (1) *Was "knowledge" an issue?*

First, petitioners seem to contend that actual or subjective knowledge of the unlawful character of their conduct was not an essential element of the prosecution's case once evidence supporting the Section 9.53 justification defense was admitted. This argument embraces the Tyler Court of Appeals' interpretation that the subjective knowledge element of Section 39.021 was rendered superfluous by the subsequent legislative enactment of Section 9.53 which creates a defense based upon an objective, "reasonable person" basis.

This argument was mortally wounded in the Texas Court of Criminal Appeals. That court acknowledged that the Tyler court's conclusion might be valid as an abstract legal proposition. But, such a conclusion, even if valid, could not change the fact that the court's charge in this case submitted actual knowledge as an essential element.[3] Thus, it was necessary under the court's charge for the State to prove actual knowledge beyond a reasonable doubt.

Moreover, the Texas Court of Criminal Appeals had an opportunity to review the element of knowledge of unlawfulness in connection with the State habeas proceedings in this case. The court referred several times to the statutory requirement that the defendant knew his conduct was unlawful. *Ladner v. State,* 780 S.W.2d 247, 255 (Tex.Cr.App.1989). The court made no accompanying reference to any objective standard or any reasonable person test. Instead, the court said,

> "Section 39.021(a)(1)(2), supra, specifically makes such knowledge an element of the offense." *Id.*

This court must accept pronouncements of the Texas Court of Criminal Appeals as the final exposition of what Texas law requires as proof of a Texas state offense. The

pronouncement of the Texas Court of Criminal Appeals is that the legislature intended the knowledge element to be determined subjectively. This court will follow the interpretation of the Texas Court of Criminal Appeals.

Moreover, the record before this court belies the suggestion that petitioners' actual knowledge was not at issue. At the truncated habeas corpus hearing before the state trial judge, Paul Buchanan, attorney for petitioner Hyden, conceded that the allegation that Ladner struck the blows "knowing his conduct was unlawful" was disputed. [Respondents' Exhibit 4, Page 15]. Further, the trial record reflects that it was clearly a part of Ladner's trial strategy to show that he believed his conduct was lawful. At opening argument, defense counsel told the jury that the evidence would show that his client had done nothing wrong. (Petitioners' Exhibit 8A, p. 17). Likewise, at final argument counsel reiterated that, from his client's point of view, his conduct was justified. (Petitioners' Exhibit 8I, pp. 642–43). This theory was reinforced by Ladner's trial testimony, in which he attempted to present himself as a man who believed he had acted properly. (See Petitioners' Exhibit 8H, pp. 259–279).

Also enlightening is an excerpt from Ladner's additional testimony. After Ladner testified that two of the State's witnesses were regularly in his jail, he testified as follows:

Q: And people like that who are back and forth in jail and back and forth in the penitentiary, in your opinion, do they get to where they view law enforcement officers as people on the other side, people they're—

A: Yes, sir, I would think so.

Q: And from your observations and your dealings with people like that and

---

**3.** The court's charge stated:

Now keeping in mind the foregoing instructions if you find from the evidence beyond a reasonable doubt that on or about the 25th day of December, 1987, in Sabine County, Texas, the defendant, Thomas Ladner, while a peace officer, intentionally subjected Loyal Garner, Jr., while in custody, to bodily injury, to-wit: By

striking him on the head with a slapstick, *knowing his conduct was unlawful,* and that the death of Loyal Garner, Jr., occurred therefrom, and that the use of force was not justified by the instructions heretofore given in this charge, then you will find the defendant Thomas Ladner guilty of the charge of violations of civil rights of a prisoner, as alleged in Count One of the Indictment. [Emphasis Supplied]

their attitude toward law enforcement officers, do you have an opinion as to whether or not those kinds of people would like to get at a law officer and have something on a law officer?

.    .    .    .    .

Q: Do you feel like those kinds of people would like to have something on a law officer?

A: Possibly so.

Q: Tell us whether or not one of these men said a statement to you in a threatening way about this subject?

A: Yes, Mr. Bozeman.

Q: What did Mr. Bozeman say to you?

A: He said, "Well, I'd like to see you in the penitentiary also".

Q: Let me ask you this question. In that connection, Thomas, knowing people are in the jail like that and had that attitude, is there any way in the world that you would commit a crime in front of people like that?

A: No, or anyone else.

Q: All right. Certainly if you were going to do something, take somebody off and do something illegally, would you do it in front of people that you know to have animosity toward you and have hostility toward you?

A: No, sir.

(Petitioners' Exhibit 8H, pp. 290–91). The above testimony stands as a clear statement that Ladner did not believe, and certainly did not know, his conduct was unlawful.

The petitioner further called into issue the question of whether the use of force was unlawful, and therefore inferentially whether he could have known it was unlawful. The petitioner testified extensively as to the altercation he had with Loyal Garner. (Petitioners' Exhibit 8H, pp. 270–271; 286; 291). The petitioner specifically testified as to his knowledge of the lawful use of force upon a person in custody. (Petitioners' Exhibit 8H, pp. 311–12; 370).

The record is replete with other witnesses' testimony regarding the lawful use of force. Sheriff Blan Greer testified to his policy regarding the use of force against a prisoner who was making noise. (Petitioners' Exhibit 8A, pp. 40–43). Sheriff Greer further testified to his policy regarding tolerance of the use of unreasonable force. (Petitioners' Exhibit 8A, pp. 62–63, 67). Ranger Roscoe Davis testified to whether he believed the situation could have been handled without the use of deadly force. (Petitioners' Exhibit 8D, p. 41). Further, on cross-examination, Ranger Davis testified to his opinion of the use of force under these circumstances. (Petitioners' Exhibit 8D, pp. 49–50).

The petitioner's co-defendant, James Hyden, testified to the petitioner's altercation with Loyal Garner. (Petitioners' Exhibit 8H, p. 431). Finally, the State in rebuttal entered testimony from Lloyd Armstrong, raising an allegation of a previous unreasonable use of force by petitioner Ladner. (Petitioners' Exhibit 8H, pp. 403 *et seq.*) Considering all of the above, the question of lawful use of force, and the petitioner's knowledge of whether his use of force was lawful, was clearly in issue.

(2) *Was there evidence to acquit on the "knowledge" element?*

Petitioners' second argument concerning the unique actual knowledge element of the Sabine County civil rights prosecution seems to be that no rational jury could have acquitted them under the evidence admitted on this element. Again, this argument is difficult to follow. The gist of it is that since Ladner testified that he knew he was entitled under the law to use only that force which was reasonably necessary, he did not seriously contest at trial that he knew his conduct was unlawful.

This argument is circuitous and illogical. One cannot simultaneously dispute knowledge of unlawful conduct in order to avoid confessing guilt while conceding the issue for all other purposes. Moreover, as the Attorney General correctly argues, simply because Ladner testified that he knew the law, it does not necessarily follow that he was conceding that he knew at the time of the incident that his conduct was unlawful. To the contrary, it tends to support the notion that he knew he was allowed to use

reasonable force, and that he believed, subjectively, that his use of force was reasonable.

In short, the jury was entitled to believe Ladner and the codefendants as to their version of the extent and circumstances of the altercation Ladner had with Loyal Garner, Jr. Further, the jury was entitled to believe Ladner's testimony that he knew the law regarding use of excessive force, and that if he were to violate that law, he would not do so in the presence of witnesses. The jury had the right to credit this testimony, and if this testimony was believed, the jury had no choice but to acquit Ladner on the ground that the State failed to prove beyond a reasonable doubt the "actual knowledge" essential element of the civil rights offenses.

### D. Conclusions

An examination of the record of the prior proceedings, taking into account the pleadings, evidence, charge and other relevant matter, leads to the conclusion that a rational jury could have grounded its verdict upon an issue other than justification, which is the issue the petitioner seeks to foreclose from consideration in the pending Smith County murder cases. Accordingly, the Smith County prosecutions are not barred by the collateral estoppel component of the constitutional prohibition of double jeopardy.

The report and recommendation of the United States magistrate is ADOPTED, movants' objections are OVERRULED, and the petition for writ of habeas corpus and the motion for stay of state court proceedings are DENIED.