Thomas E. LADNER & James
Hyden, Appellants,

v.

The STATE of Texas, Appellee.

Nos. 12–90–00225–CR, 12–90–00253–CR.

Court of Appeals of Texas,
Tyler.

Dec. 31, 1993.

John H. Seale, Jasper, Paul N. Buchanan, Beaumont, for appellants.

Amy Blalock, Asst. Dist. Atty., Tyler, for appellee.

HOLCOMB, Justice.

This is an appeal from a jury verdict finding Appellants, Thomas E. Ladner, James M. Hyden, and Billy Ray Horton, guilty of murder. The jury assessed Ladner's punishment at 28 years imprisonment, Hyden's punishment at 14 years imprisonment, and Horton's punishment at 10 years imprisonment. Appellants were indicted separately but their cases were consolidated for trial. Thomas E. Ladner's and James M. Hyden's appeals have been consolidated in this opinion as Hyden adopted Appellant Ladner's brief which brings 33 points of error.

Billy Ray Horton's appeal will be addressed by a separate opinion.

Point of error thirty-two alleges that the trial court erred in "rendering a judgment of conviction based upon the verdict of the jury because the verdict is contrary to the law and evidence."

The standard for reviewing sufficiency of the evidence questions such as this is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Butler v. State*, 769 S.W.2d 234, 239 (Tex.Cr.App.1989); *Jackson v. State*, 672 S.W.2d 801 (Tex.Cr. App.1984). We are required to position our-selves as a final due process safeguard, ensuring only the rationality of the fact-finder considering all the evidence the jury was permitted to consider, whether rightly or wrongly. *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Cr.App.1988). With this standard in mind, we have reviewed all the evidence presented in the record, and will set forth that evidence which supports the judgment.

Loyal Garner, Johnny Maxie, and his brother Alton Maxie set out in Garner's pickup truck after lunch on December 25, 1987, from Florian, Louisiana, supposedly to look for a timing chain for Johnny Maxie's vehicle. They were unable to find a chain nearby because the wrecking yards were closed on Christmas Day. They decided to drive to the community of Liberty, located in Newton County, Texas, so that Johnny Maxie could get his car, which was at his wife's house. On the way to Texas, they stopped at a liquor store and purchased rum, whiskey, and beer, a portion of which they consumed. When they reached the outskirts of Hemphill, they were pulled over by Thomas Ladner and James Hyden, allegedly because their vehicle was weaving on the highway. At the time, Ladner was the Chief of Police in Hemphill, and Hyden was a Deputy Sheriff of Sabine County. After they were stopped, Garner was charged with "Driving While Intoxicated," and Johnny and Alton Maxie were charged with "Public Intoxication." They were then placed in the city police car and taken to the Sabine County Jail in Hemphill.

After being "booked," they were all placed in the detoxification tank,[1] which is a cell without bunks where intoxicated prisoners are kept until they are sober. After being placed in the tank, Garner and the Maxie brothers started yelling obscenities and pushing on the cell door, allegedly to gain attention so that someone would allow them to make a telephone call to their families. The evidence reflects that pushing on the tank's door caused a red light to come on in the dispatcher's office. They were told by Mary Russell, the dispatcher, they would be allowed to make a phone call after they had been in jail for four (4) hours. However,

---

1. A detoxification tank is sometimes referred to as the "drunk tank," but from this point for the remainder of this opinion we will simply refer to it as the "tank."

they continued to push on the door and yell. They were told, presumably by Horton, that if they didn't quit, they would be "stomped," and they in turn responded, "You'd better bring four or five if you're going to do it," or words to that effect. Between 9:30 and 10:00 p.m., Ladner and Hyden returned to the jail and were told what Garner and the Maxie brothers were doing. They went to the tank, and Ladner, upon entering the cell, asked who was pushing on the door and yelling the obscenities. Alton Maxie testified that Garner, who was standing, said that he was, and Ladner struck Garner in the head at least three (3) times with a slap-jack. Ladner and Hyden then grabbed Garner around his neck and carried him out of the tank into the hallway.

Melton Sangwin, Jr., an inmate of the jail, testified that he heard a scream after Garner was taken to the booking room. Angus Bozeman, another inmate located in the cell next to Garner and the Maxie brothers, heard the scuffle and the sound of licks in the cell, and moments later, other licks and sounds of a scuffle but he could not tell whether it was in the hallway or the tank. He heard Ladner tell someone, "Hand me a black-jack." He then heard Ladner say, "Sit down, boy." Thereafter, he heard screams, and later heard someone taking Garner back to the cell.

According to Alton and Johnny Maxie, Garner was conscious when he was taken from the cell to the booking room. Alton and Johnny Maxie testified that Garner was brought back to the cell after ten or fifteen minutes, with Ladner and Hyden holding him by his arms. They set him down on the concrete ledge and told Alton Maxie to come with them. Alton testified that he followed them into the booking room and Hyden asked him if he wanted "some of the same," and at that time, he saw Ladner hitting a nightstick against his own hand. He observed blood on the floor around a chair. He was told by Billy Ray Horton that he could make a telephone call, but to tell whoever he called that they could not get out until morning. Alton then called his mother and told her where they were. He testified that Horton kept his finger on the receiver, which he

(Alton) believed was to prevent him from telling his mother what had happened. He was then taken back to the cell by Horton, and Johnny Maxie was taken to make his phone call. Johnny testified that he tried to place a call to Constable Holton Johnson in Newton County, but Johnson was unavailable. He remained in the booking room until Johnson returned the call. Johnny told Constable Johnson that he would be unable to meet with him regarding some "help" he was providing on narcotic trafficking between Texas and Louisiana. Johnny did not mention anything to the constable about what had happened to Garner. Alton and Johnny Maxie both testified that Garner was in a comatose state after he was returned to the cell; his eyes were "fixed" and in an opened, unblinking position, his breathing was irregular, and he was bleeding from a small cut in the back of his head. They testified that Ladner and a trustee came in about thirty (30) minutes later to the tank with jail clothing and asked them to change Garner's clothes because of the blood on his shirt. They refused to do so.

Trent Taylor, a trustee in the jail, testified that he was in an adjoining cell with inmates Keith Miller and Angus Bozeman. He testified about Garner and the Maxie brothers being placed in the tank and related their rattling the door and yelling that they wanted to make a phone call, and about a cursing match that was had between Bozeman and someone in the tank. He related that someone came down and told the inmates in the tank to quit or he would stomp their ass. Someone in the tank said, "You better bring four or five with you." He remembered hearing Ladner tell someone repeatedly to "get up" while a scuffle took place, and also tell someone, "Hand me the black-jack." He didn't know whether this happened in the hallway or in the tank. He testified that he heard four or five solid "licks," and then a sound like metal hitting the floor. Approximately thirty (30) minutes after this, Ladner came and got him out of the cell to do some clean up work. Taylor went to the kitchen to get the mop and Ladner told him to also get some clothes for an inmate. Then they went to the tank and Ladner tried to get him and the Maxie brothers to wake Garner up and

change his clothes because of the blood. He testified that the two brothers said they didn't want to wake him up, and that he needed a doctor. Taylor testified that after he cleaned up spots of blood in the hallway, he went to sit in the dispatcher's office. There, he saw a slap-jack with the end opened, which would have allowed the lead to slide out. The next morning, after Garner was taken to the hospital, he cleaned up blood in the tank. The Maxie brothers testified that after Ladner and Taylor left, they went to sleep and were awakened for breakfast the next morning by a deputy, Clyde Kirk. Kirk determined that Garner needed to see a doctor and an ambulance was called. Garner was subsequently taken to the hospital in Hemphill. There, Dr. Grover Winslow tried to stabilize Garner's condition, but ultimately transferred Garner to Tyler, where Dr. R.S. Donaldson treated him for a subdural hematoma and performed an operation to relieve pressure in the brain. Garner was placed on a life-support system and when it was determined that he was "brain dead," the life-support system was removed and Garner expired.

Dr. Donaldson testified that the amount of force needed to cause the injuries he observed would be similar the force necessary for someone to hit a baseball into centerfield.

Dr. Virgil Gonzales, who performed the autopsy, testified that the cause of death was several severe blows to the victim's head, consistent with being struck by a "slap-jack" or "slap-stick." Dr. Gonzales stated that it was the same type of injury to the head as you might expect to see in someone who had been in an automobile collision. He further testified that the injury would not have been consistent with someone having tripped and fallen, and then hitting his head as presented by the Appellants' testimony, which had been read into the record from testimony given before the Smith County Grand Jury. He further testified that for a person to have struck the victim as he observed, that person would have intended to cause serious bodily injuries which would clearly be dangerous to Garner's life.

■ We hold that the evidence is sufficient and a rational jury could have found from the direct and circumstantial evidence, and the inferences therefrom, that Appellants Ladner and Hyden committed the murder of Garner as charged. This point of error is overruled.

■ In their first point of error, Appellants allege the trial court erred in not granting their motion for an instructed verdict because they were tried twice for exactly the same conduct, and thus, their constitutional rights against double jeopardy were violated. Appellants' arguments have been extensively reviewed by this and other courts.

On January 5, 1988, Appellants were indicted in Sabine County, Texas, for violating the civil rights of Loyal Garner, Jr. Subsequently, on March 3, 1988, an indictment was returned against Appellants in Smith County, Texas, for the offense of murder. After a jury trial in Sabine County, Appellants were acquitted of the charges for civil rights violations against Garner on July 15, 1988. The judge of the 241st District Court of Smith County held a hearing on Appellants' petition for writ of *habeas corpus* the following day and denied relief.

The denial of relief was appealed to this Court. We reversed the trial court's judgment and ordered the murder indictments dismissed. *Ladner v. State,* 790 S.W.2d 671 (Tex.App.–Tyler 1988, pet. granted). The Court of Criminal Appeals reversed this Court, holding that we had incorrectly applied the doctrine of collateral estoppel. *Ladner v. State,* 780 S.W.2d 247 (Tex.Cr.App. 1989). They held that the Sabine County jury could have based its acquittal in the civil rights prosecution on a failure of the State to prove that Appellants "knew [their] conduct was unlawful." *Ladner,* 780 S.W.2d at 255.

Appellant sought *habeas corpus* relief through the federal courts; relief was denied. *Ladner v. Smith,* 941 F.2d 356 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1665, 118 L.Ed.2d 387 (1992). The Court of Criminal Appeals and the Federal Courts all held that, under the analysis of *Ashe v. Swenson,* relitigation after acquittal is barred if the factual issue was necessarily resolved in the Appellants' favor in the first prosecution. *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). These courts held

that Appellants had not shown that an element of the offense of murder had been necessarily established against the State in the first trial. *Ladner v. Smith,* 941 F.2d 356; *Ladner,* 780 S.W.2d at 254–56.

The Fifth Circuit Court made an extensive analysis of this case under the then recent case of *Grady v. Corbin,* 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990). Appellants also argue that under *Grady,* their claim of double jeopardy should be sustained. However, as we understand *United States v. Dixon,* —— U.S. ——, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993), the analysis of a double jeopardy claim is governed by *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), and *Ashe v. Swenson,* since *Grady* was explicitly overruled. *See Dixon,* —— U.S. at ——, 113 S.Ct. at 2860. Therefore, we will not review those arguments and content ourselves with the prior analysis under *Ashe.*

We accept our Court of Criminal Appeals' decision that Appellants' protection against being twice put in jeopardy had not been violated. Point of error one is overruled.

■ In points of error three and four, Appellants complain that the trial court erred in refusing to submit to the jury the fact question of double jeopardy and for excluding the testimony of District Attorney Charles Mitchell, to the effect that the previous prosecution in Sabine County arose from the same criminal episode for which Appellants were being tried in Smith County. In these points of error, they contend the trial court should have allowed evidence before the jury in support of their plea of former jeopardy and then present the plea in the jury charge. In view of the fact the Court of Criminal Appeals had at that time ruled as a matter of law that double jeopardy had not attached, we hold that the trial court was correct in not allowing the testimony of Mitchell or charging the jury in the manner requested. Therefore, these points are overruled.

■ In point of error number five, Appellants contend the trial court erred in refusing to grant a mistrial because the prosecuting attorney used the word "settled" when questioning the deceased's widow about a civil suit she had filed. The record reflects that the trial court sustained the Appellants' objection to the use of the word "settled," and instructed the jury to disregard what the District Attorney had said. Appellants' request for a mistrial was denied. The court's sustaining the objection and instructing the jury to disregard were sufficient to cure any harm. *Hernandez v. State,* 805 S.W.2d 409 (Tex.Cr.App.1990); *Stoker v. State,* 788 S.W.2d 1 (Tex.Cr.App.1989). The statement made by the District Attorney, and the context in which it arose, was not so inflammatory that it could not be cured by an instruction by the trial court. The trial court did not err in overruling the Appellants' motion for mistrial. *See Thomas v. State,* 578 S.W.2d 691, 695 (Tex.Cr.App.1979). Point of error five is overruled.

In point of error number six, Appellants object to the questioning of Blan Greer, the Sheriff of Sabine County, concerning furnishing medical aid to Loyal Garner. Greer testified that Sabine County policy required jailers and deputy sheriffs who were aware that an inmate had been injured to check on the inmate and notify a medical doctor. Greer testified that any time an inmate refused medical assistance, that refusal was to be documented right away. He further testified that there was no documentation or any other indication that Garner had refused medical treatment. Appellants objected to this testimony as irrelevant.

■ In order to be admissible, evidence must be relevant to a contested issue. An item of evidence is relevant if it logically increases one's knowledge and enhances the likelihood of ascertaining the truth about a given fact. *Brown v. State,* 757 S.W.2d 739 (Tex.Cr.App.1988). The determination of whether the evidence is relevant to an issue in a case lies within the sound discretion of the trial court and should not be disturbed, absent a clear abuse of discretion. *Johnson v. State,* 698 S.W.2d 154 (Tex.Cr.App.1985), *cert. denied,* 479 U.S. 871, 107 S.Ct. 239, 93 L.Ed.2d 164. It is reviewable by this standard. The State argues that if Appellants fatally assaulted Garner, then violated county policy by not seeking medical attention for

him, their failure to seek medical attention supports the State's contention that the Appellants acted intentionally and knowingly. We agree. If evidence tends to demonstrate a fact helpful in the determination of the existence of the required intent, that evidence is admissible. TEX.R.CRIM.EVID. 401, 402 & 403; *Soffar v. State,* 742 S.W.2d 371, 377 (Tex.Cr.App.1987). The trial court did not abuse its discretion in overruling the Appellants' objection. Point of error six is overruled.

█ Next, in point of error number seven, the Appellants complain of the trial court overruling their motion for mistrial based upon the airing of a television newscast. This particular newscast featured members of the National Association for the Advancement of Colored People (NAACP). One of the members said that this was an important case and they would take "action" if the Appellants were not convicted. It cannot be inferred from the context of the broadcast what "action" was contemplated, whether it was political action, *e.g.,* demonstrating, picketing, or mobilizing voters. Appellants claim, however, that this broadcast made it impossible for them to obtain a fair trial. Every claim of jury prejudice because of media attention appearing during a trial must turn on its own facts. *Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959).

The record shows that the judge admonished the jury before the trial commenced, instructed them not to view television, and that they were to turn the television off if a program came on that dealt with the case. The judge also told the jury not to read any newspapers that might contain items about the trial. The court reviewed the broadcast and ruled that no further inquiry was necessary in light of his previous instructions and admonishments, and therefore refused to grant a mistrial.

Our Court of Criminal Appeals has not formulated a doctrine for dealing with mid-trial publicity. The federal courts, however, have addressed it. In *United States v. Manzella,* 782 F.2d 533, 541–44 (5th Cir.1986), *cert. denied, sub nom, Jimenez v. United States,* 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986), the court held that in determining possible prejudice, the trial court must first look at the nature of the news material in question to determine whether it is innately prejudicial; factors such as the timing of the media coverage and its possible effects on legal defenses are to be considered. Second, the court must ascertain the likelihood that the publicity has in fact reached the jury. It appears that the broadcast in question did not actually touch on the merits of the trial itself, nor did it address the prior criminal trial or the civil litigation. As we are able to glean from the record, the broadcast did touch on political reaction to the case. The newscast was not inherently prejudicial to Appellants, and because the chance of it reaching the jury was remote, we find that the trial court did not abuse his discretion. The Appellants' seventh point of error is overruled.

█ Points of error eight, ten, fourteen, and twenty-seven deal with the refusal of the court to: (1) allow testimony that Alton Maxie had told Deputy Sparks that he saw Loyal Garner taking little white pills on the afternoon before he was arrested; (2) permit Appellants' counsel to question Johnny Maxie about his prior inconsistent statement that the purpose of the trip to Texas was drug related; (3) admit into evidence defendants' Exhibit 12, which was a statement reportedly given by Johnny Maxie on December 26, 1987 at 9:15 a.m., to Deputy Clyde Kirk, in which it was stated that the purpose of the trip to Texas was related to an illegal drug transaction; (4) allow one of Appellants' counsel to question Johnny Maxie about his testimony before the Sabine County Grand Jury, which supposedly related that drugs were the purpose of the trip to Texas; and (5) admit the testimony of Constable Johnson about his relationship with Johnny Maxie, and what Johnny Maxie had told him about the drug deal. All of these allegations involve the same issue; that is, the attempt of Appellants to show that Garner's real reason for going to Texas was to engage in an illegal drug transaction.

In regard to the questioning of Alton Maxie, whether he had told a deputy that he had seen Garner taking some white pills the af-

ternoon before; the trial court sustained the State's objection on the basis of relevancy. However, later on, Appellant Ladner was allowed to ask Alton Maxie if he had seen "Loyal taking any such [pills]?" to which the witness replied, "No." The trial court denied Ladner's request to question the Sabine County Constable regarding statements that Johnny Maxie had previously made to him.

In a bill of exception, it appears that Johnny Maxie was working for Constable Johnson for the purpose of interdicting drugs supposedly going from Texas into Louisiana. In the bill, Johnson testified, in effect, that Johnny Maxie told him the purpose of the trip to Texas was part of this illegal drug trafficking, and that he had, on previous occasions, seen Johnny Maxie under the influence of drugs and alcohol. The court had previously granted the State's motion in limine, in which he noted, "I'm not going to admit proof that they were dealing in drugs unless it has some relevance to some issue in the trial of this case." In this regard, the pathologist, Dr. Gonzales, testified that no illegal drugs were found in Garner's system, except valium. There was testimony that the valium was given to Garner by the doctor at the Sabine County Hospital.

Whether evidence is admissible on an issue at trial is subject to the discretion of the trial judge and will not be overruled, unless abuse of discretion is clearly shown. Whether Garner was or was not involved in drug trafficking at the time he was placed in the jail had no bearing on whether the Appellants committed the act of which they were charged. We hold that the trial court did not abuse his discretion by excluding this evidence. These points of error are overruled.

In points of error nine and nineteen, Appellants complain of the trial court overruling their hearsay objection to certain testimony. While in jail, after the incident in question, Johnny Maxie purported to relate what his brother Alton Maxie told him about a phone call. At another point, Angus Bozeman, an inmate of the jail at the time, was allowed to testify about what another inmate told him. The testimony concerning the alleged hearsay by Johnny Maxie, purporting to relate what a brother told him about a phone call

and the circumstances surrounding it, appears to have happened in this fashion: after Garner was returned to the tank, supposedly unconscious, Alton Maxie was allowed to make a telephone call. Afterward, he related to his brother that Horton (a co-defendant) had allowed him to make the phone call, but instructed him to inform his mother that there was nothing she could do until the following morning, and that Horton held the base of the telephone so he could immediately disconnect the phone. It is the content of this conversation which the Appellants object to as hearsay. However, Alton Maxie had previously testified to these same facts without objection. Angus Bozeman testified that his cell-mate, Trent Taylor, said that Ladner had wanted Taylor to "clean up some blood in the drunk tank around some black man." Bozeman testified that Trent Taylor described the black man as "laying in the floor in detox ... [with] knots on his head and he was bleeding pretty bad." This was objected to by the Appellants. Taylor himself testified later in the trial that Ladner had requested him to change Loyal Garner's clothes and clean anything that needed to be cleaned up, and that he got a mop and mopped up blood in the hallway of the jail. He also testified that Garner was "laying there on the concrete bench" and "had blood on his face and shirt and there was some running out of his head," and the blood formed a "puddle on the floor." Therefore, essentially the same evidence which Angus Bozeman testified to was admitted without objection through Trent Taylor.

■■■ The admission of hearsay evidence does not constitute reversible error if the same facts were proven by evidence introduced in the record without objection. *Thomas v. State*, 621 S.W.2d 158, 164 (Tex. Cr.App.1981) (opinion on motion for rehearing); *Brasfield v. State*, 600 S.W.2d 288 (Tex. Cr.App.1980); *Huff v. State*, 560 S.W.2d 652, 653 (Tex.Cr.App.1978). If the fact to which the hearsay relates is sufficiently proven by other competent and unobjected to evidence, as in the instant case, admission of the hearsay is properly deemed harmless and does not constitute reversible error. *Livingston v. State*, 739 S.W.2d 311 (Tex.Cr.App.1987),

*cert. denied,* 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895; *Anderson v. State,* 717 S.W.2d 622, 627 (Tex.Cr.App.1986); *Pierce v. State,* 733 S.W.2d 314 (Tex.App.—Tyler 1987, no pet.). These points of error are overruled.

■ We will address points of error twelve and thirteen together, as they relate to the trial court's allowing the prosecutor to place into evidence certain portions of Johnny Maxie's statement in order to show consistency with the present testimony, and the court's refusing to allow certain testimony regarding the relationship between Johnny Maxie and Constable Johnson. To show that Garner was coming to Texas for the purpose of an illegal drug transaction when he was apprehended and jailed, Appellants attempted to introduce evidence that Johnny Maxie and Constable Johnson had a certain relationship in regard to drug transactions. This testimony was not allowed. The trial court found that it was not relevant to the issues at trial and its prejudicial impact would outweigh its probative value. The trial court's refusal to admit evidence is reversible only if the evidence is relevant and its exclusion harmed the accused. *Mowbray v. State,* 788 S.W.2d 658 (Tex.App.—Corpus Christi 1990, pet. ref'd); *Canto–Deport v. State,* 751 S.W.2d 698, 700 (Tex.App.—Houston [1st Dist.] 1988, pet. ref'd.). We agree with the trial court that the relationship between Johnny Maxie and the constable was not relevant. We find no abuse of discretion. These points are overruled.

In points of error fifteen and sixteen, Appellants claim that a new trial should be granted because the trial court erred in excluding evidence that three attorneys representing Alton Maxie and Johnny Maxie and three attorneys representing the Southern Poverty Law Center were present at the inquest hearing in Tyler in February, 1988, and were allowed to sit at the counsel's table with the Assistant District Attorney. Appellants claim that the testimony of Alton Maxie at the hearing, and thereafter, differed from previous written statements and sworn testimony. They further argue that the jury should have been allowed to consider the presence of these lawyers, and what influ-

ence they may have had, when deciding the credibility of the Maxie brothers.

■ We find that the trial court first ruled on the question of the lawyers' presence when the issue was presented at a pretrial hearing on a State's motion in limine. The State had argued that the involvement of the Southern Poverty Law Center, a foundation in Alabama which deals with civil rights violations that have allegedly been committed against minorities, was not relevant to the murder trial proceedings. The trial court granted the State's motion and commented, "to the extent of my ability to do so, I'm going to eliminate or minimize any racial overtones in this case." We infer that the court was properly concerned about the racial issues involved. By allowing the evidence of the attorneys' presence, and the circumstances of why they were there, race would have been injected into the proceedings, which could possibly confuse and mislead the jury. The record reflects that Appellants were allowed to adequately cross-examine the Maxie brothers about their prior statements; therefore, the exclusion of the fact that their civil attorneys and the Southern Poverty Law Center's attorneys were present at the inquest did not impair the Appellants' ability to impeach the Maxie brothers. We find that the trial judge did not abuse his discretion in excluding this evidence. These points of error are overruled.

In points of error seventeen and eighteen, Appellants complain of the trial court excluding testimony and evidence showing details of previous DWI convictions of Alton and Johnny Maxie. Appellants claim the prior conviction of the Maxie brothers was relevant to their credibility as witnesses, and the failure of the trial court to allow inquiry into these prior DWIs constituted reversible error and abuse of discretion.

■ It appears that Alton Maxie had two DWI convictions from 1987. Johnny Maxie had been arrested and convicted of DWI one time prior to the incident in Hemphill. In a pre-trial motion in limine, the trial court ruled that these offenses were not admissible unless the witness somehow brought the sub-

ject up (*i.e.*, denied ever driving while intoxicated, said they had never been in jail before, *etc.*). At trial, the witnesses never testified in a manner which would have "opened the door" for these issues. When Appellants attempted to delve into these matters, the trial judge excluded the testimony.

Rule 609 of the TEXAS RULES OF EVIDENCE provides the framework for impeaching a witness by evidence of conviction of a crime. The Rule provides that evidence of a previous conviction is admissible only if the "crime was a felony or involved moral turpitude, regardless of the punishment, and the court determines that the probative value of admitting this evidence outweighs this prejudicial effect to a party." TEX.R.CRIM.EVID. 609(a). The Rule also requires that the offense be committed within ten (10) years of the date of the impeachment. TEX.R.CRIM.EVID. 609(b). Even though the DWIs were committed within a ten year period, they were misdemeanor offenses. A misdemeanor DWI is not an offense involving moral turpitude. *Shipman v. State,* 604 S.W.2d 182 (Tex.Cr.App.1980); *Holden v. State,* 628 S.W.2d 166 (Tex.App.—Houston [14th Dist.] 1982, pet. dism'd). Therefore, the trial court did not abuse its discretion by granting the State's motion in limine and refusing to allow Appellants to impeach the State's witness in this matter. These points of error are overruled.

■ In point of error twenty, Appellants complain of the trial court excluding testimony of Sabine County District Attorney Charles Mitchell concerning a case in the Sabine County area shortly before the occurrence involved in this case where a man was beaten to death by another with his fists, and the fists were alleged to be a deadly weapon. Appellants attempted to cross-examine this witness concerning that incident. The State objected on the grounds of relevancy and the judge sustained the objection. That incident did not involve Garner, the Appellants, or any officers involved in this case. However, Appellants argue that it would affect the state of mind of the Appellants. The exclusion of evidence is not reversible error unless the evidence is relevant to the case and the exclusion harms the appellant. The evidence which was proffered did not involve the beating of a peace officer; there was no testimony that Appellants knew of the incident, nor was there any evidence of the correlation between the two incidents. Mitchell could not testify that either of the Appellants had any knowledge concerning the case, or what impact that knowledge may have had on them. We find no error.

■ In points of error twenty-one and twenty-two, Appellants complain of the admission of pictures into evidence of the victim's body and the fact that certain State's exhibits of photos of the body were enlarged. The trial court allowed the State to introduce into evidence photographs of the victim's brain taken during the autopsy. In the photographs, the scalp is pulled back from the head, exposing the skull and injured areas of the brain. They contend that these photographs were highly prejudicial and should not have been admitted into evidence. It is initially up to the court to determine the relevancy and probative value to the issues at trial and whether it is outweighed by any prejudicial effect. The Court of Criminal Appeals, in *Martin v. State,* 475 S.W.2d 265, 267 (Tex.Cr.App.1972), held "if a photograph is competent, material, and relevant to the issues on trial it is not rendered inadmissible merely because it is gruesome and might tend to arouse the passions of the jury unless it is offered solely to inflame the minds of the jury." The question involves whether the photographs were able to enlighten the jury, and the court's decision will not be disturbed on review in the absence of a showing of abuse of discretion. *Terry v. State,* 491 S.W.2d 161, 163 (Tex.Cr.App.1973). In *Harris v. State,* 661 S.W.2d 106, 107 (Tex.Cr.App. 1983), it was held, "where pictorial evidence will help the jury to understand verbal testimony, such as the technical language used by a medical doctor in describing the injuries sustained by a victim of a crime, a trial judge does not abuse its discretion in admitting these photographs." Autopsy or post-autopsy photographs can be used to illustrate and clarify a medical expert's description of injuries and to reveal the cause of death. As long as the photographs aid the jury in understanding the injury and do not emphasize

the mutilation of the victim caused by the autopsy, then the photographs are admissible, notwithstanding the fact they were taken after the autopsy. Here, the pathologist testified that enlarging the photographs elucidated the extent of the laceration and the contusion, which he stated was necessary in order for the jury to understand his findings of damage to the brain. Appellant cites *Taylor v. State*, 491 S.W.2d 922 (Tex.Cr.App. 1973), in which the Court of Criminal Appeals found error in the admission of a post-autopsy photograph. In that case, the Court found that the pictures unduly emphasized the mutilation of the victim caused by performing the autopsy, and pictures were also shown by slides, which may have exacerbated the harm of admitting them.

It appears from the record here, that the pictures of Garner's brain were relevant and material for several reasons. First, they helped the jury to understand the technical and difficult medical terminology used by the pathologist, and to understand the different sections and layers of the brain. A layman may not be able to visualize the various areas of the brain, and pictures may help the jury understand the complex language of the pathologist. They were relevant to show the severe injury and bruising of the brain and the nature and number of blows which were struck. Dr. Gonzales' testified that the pictures were essential to accurately explain his findings concerning the type of injuries the victim sustained and the force it took to inflict them. The thrust of the Appellants' defense at trial was that the victim hit his head on the wall and this was the impact which caused his death. The testimony of the pathologist, coupled with the pictures, evidenced that death was not caused in this manner. The injured areas of the brain were visible only after the skin was drawn back from the skull. Dr. Gonzales' testimony, aided by the photographs, was crucial for the State to show the severe force allegedly used by Appellants, and to prove the intentional nature of the injuries sustained by the victim. The trial court found their probative value outweighed any prejudicial or inflammatory effect they may have had on the jury. The record reflects that the trial court instructed the State not to display the exhibits more than absolutely necessary as an aid to the pathologist's testimony. For all the reasons given above, we find that the trial court did not abuse his discretion in admitting the pictures. Points of error twenty-one and twenty-two are overruled.

In point of error twenty-three, Appellants complain of the trial court's denial of their motion for mistrial based on the trial court's criticism of one of the defense counsel. Appellants contend that the trial court improperly overruled their request for a mistrial made during attorney Haas' (who was representing co-defendant Horton) cross-examination of the pathologist. The Appellants allege that it was a comment on the weight of the evidence. The exchange is set forth as follows:

MR. HAAS: So that—okay. And it would likewise be inconsistent if there were witnesses who testified that they saw Loyal Garner, Jr. looking like he was asleep with his eyes closed and breathing like—breathing regular?

MR. SKEEN: Judge, I'm going to object to counsel trying to get the doctor to comment on testimony of some other witness.

MR. HAAS: [QUESTIONING THE WITNESS]: I'm not trying to. He is an expert witness, Your Honor.

THE COURT: Well, I'm not sure that was an expert question.

MR. HAAS: Well—

THE COURT: He answered your question. You go to another one.

MR. HAAS: Judge, that wasn't—

THE COURT: Don't argue with me.

MR. HAAS: I'm not.

THE COURT: Don't argue. Sit down.

MR. HAAS: I'm not arguing.

THE COURT: Yes, you are.

MR. HAAS: No, I'm not, sir.

THE COURT: He answered your question. You go to another one.

MR. HAAS: [QUESTIONING THE WITNESS]: The question I had asked that a witness had seen Mr. Garner with his eyes closed and breathing regular—

MR. SKEEN: Judge, I apologize for interrupting.

THE COURT: Just a minute. We are going to have a 15 minute recess, ladies and gentlemen. When we get back, Mr. Haas will have five minutes to finish your cross-examination.

**(JURY RETIRES FROM THE COURTROOM.)**

**(RECESS.)**

To constitute reversible error, a comment by a trial judge must be reasonably calculated to benefit the State or to prejudice the defendant. *Strong v. State*, 805 S.W.2d 478 (Tex.App.—Tyler 1990, pet. ref'd.). Our view of the trial court's comments is that they did not address any aspect of the testimony, or in any way indicate that the State's evidence was entitled to more weight than the Appellants'. It appeared to direct Mr. Haas to rephrase his question.

Appellants cite *Dixon v. State*, 775 S.W.2d 795 (Tex.App.—El Paso 1989, no pet.), in which the trial judge's comment was made during the closing argument by the State. In *Dixon*, the trial judge overruled the defendant's objection to a line of argument, commenting, "I agree that it is a reasonable inference from the evidence." The appellate court was correct in finding this was an explicit comment on the evidence. However, in the present case, it appears that Mr. Haas may have improperly phrased a question, and the trial judge sustained the State's objection. Mr. Haas then attempted to ask exactly the same question after the court's ruling. After first telling Mr. Haas he would have only five more minutes to question the witness, a recess was granted, and later, in the presence of the jury, the court told Mr. Haas he could have as long as he needed. Although Appellants suggest the trial court's comments indicate that the trial judge thought the State's examination of this witness was more valuable than the Appellant's cross-examination, this inference is not supported by the record. Holding that the court's comments did not constitute a comment on the weight of the evidence, error was not committed in denying the Appellants' motion for mistrial. This point of error is overruled.

In point of error number twenty-four, it is alleged that the court committed error in permitting the State's attorney to cross-examine a doctor who was a defense witness about information contained in a letter the State had received from another doctor he had consulted. Ladner had called Dr. Grover Winslow, the treating physician at the Sabine County Hospital, where the victim was taken on the morning after the beating occurred. He testified about an extrapolation theory, speculating what the level of alcohol in the victim's bloodstream was at the time of the incident. On cross-examination, this witness testified that he relied upon a telephone consultation he had with Dr. Wertz to confirm his conclusion on the extrapolation theory. The State attempted to introduce a letter written by Dr. Wertz to an Assistant District Attorney in which Dr. Wertz wrote that his consultation with Dr. Winslow was not a case study of the victim, Loyal Garner. The trial judge excluded the letter itself as hearsay, but allowed the State to question Dr. Winslow about his reliance on Dr. Wertz and whether he told Dr. Wertz about the fact that the victim was in a coma. Appellants contend that this improperly introduced hearsay evidence. From the record, it appears that the State was inquiring whether Dr. Winslow fully disclosed all of the details of the Garner case, as opposed to a hypothetical case, to Dr. Wertz before arriving at the extrapolation theory.

A party may cross-examine an expert witness about the basis of their opinion testimony. TEX.R.CRIM.EVID. 703. Therefore, we find that the court did not err in permitting the State's questioning of Dr. Winslow about whether, in his consultation with Dr. Wertz, he revealed the victim was in a coma, a fact which happened to be in the excluded letter. Point of error twenty-four is overruled.

In point of error twenty-five, prosecutorial misconduct is alleged in failing to furnish the Appellants' counsel with a copy of the transcript of the Smith County Grand Jury testimony of Mary Russell. Point of error twenty-six concerns the trial court's refusal to strike the testimony of Mary Russell after she was recalled by the State.

Appellants claim that the State purposely mislead them about whether certain testimony had been transcribed. During cross-examination of Mary Russell, the State questioned her about prior inconsistent statements arising out of a Smith County Grand Jury proceeding. Appellants objected, claiming they had been informed by the State that other than the defendants, no other Grand Jury testimony was transcribed. The District Attorney explained that he thought Appellants had been provided with a copy of Russell's testimony. The trial court proceeded to order the State provide the Appellants with the entire transcription of the witness' testimony, and ruled that he was not going to excuse the witness until the defense had as much opportunity as they needed to decide what to use on redirect. Appellants were granted time to review the grand jury testimony; however, they elected not to recall this witness.

It appears that the testimony of all witnesses who testified before the Smith County Grand Jury were requested by the Appellants at pre-trial. The State informed the Appellants that only the testimony of the three defendants had been transcribed, and produced that testimony before trial. As it turns out, Russell's testimony was transcribed and the State presented it before the jury to show certain inconsistent testimony.

The standard of review in determining whether or not disclosure warrants reversible error, is whether the testimony may have an effect on the outcome of the trial. *Crane v. State*, 786 S.W.2d 338 (Tex.Cr.App. 1990). The key elements which must be shown are as follows:

(1) suppression of the evidence by the prosecution after a request by the defense;

(2) the evidences' favorable character for the defense; and

(3) the materiality of the evidence.

*Crane*, at 348; *Butler v. State*, 736 S.W.2d 668, 670 (Tex.Cr.App.1987).

The State candidly admits that the testimony was subject to being struck pursuant to TEXAS RULE OF CRIMINAL EVIDENCE 614(e). It is clear that the first prong was met. The other two prongs were not present. Appellants never recalled the witness, and we infer they found that the evidence was neither favorable nor material to their defense. Appellants have failed to show, on the record, that the evidence would have affected the outcome of the trial in their favor. Our review of the record reveals that the only inconsistent evidence was whether co-defendant Billy Ray Horton was in the dispatcher's office during the time that Garner was struck. Russell testified before the Grand Jury that Horton was not in her office; and at the time of trial, she stated that she did not remember. None of this could have been construed as favorable to the Appellants. We overrule this point of error.

■■■ Point of error number twenty-eight complains of the court's overruling Appellants' objection to the court's charge because of the failure of the charging paragraph to refer to the justification defense. Appellants objected to the charge because the court, in submitting the justification defense, failed to instruct the jury that they could not find the Appellants guilty unless they find the State had negated the justification defense by proof beyond a reasonable doubt. Appellants argue that such an instruction should have been included in the charging paragraph and that its omission was reversible error. The justification defense was given in the charge as contained in Article 9.53 of the TEXAS PENAL CODE, as follows:

You are instructed that our law provides that a peace officer is justified in using force against a person in custody when and to the degree the peace officer reasonably believes the force is necessary to maintain the security of the penal institution, or his own safety or security.

Now, if you find from the evidence, or have a reasonable doubt thereof, that Thomas E. Ladner [and James M. Hyden] ... as peace officer(s) ... used such force against Loyal Garner, Jr. while he was in custody when and to the degree the peace officers, Thomas E. Ladner [and James M. Hyden] ... reasonably believed that force was necessary to maintain the security of the penal institution, or their own safety or

security, you will say not guilty by your verdict.

Appellants have not provided us with any citation which would require it to have been included in the charging paragraph, requiring the State to negate the justification defense, and we have found none. Appellants also failed to give the trial court a proposed charge to place in the charging paragraph. We hold that the justification defense charge as given substantially protected the Appellants' rights. This point of error is overruled.

In point of error twenty-nine, Appellants claim they were entitled to a jury instruction explaining why they could not ask Charles Mitchell, the District Attorney of Sabine County, who had testified that some of the "jail bird" witnesses' reputations for truth and veracity was bad, but could not ask the reputation of the Appellants, contending the failure to do so mislead the jury. Appellant does not cite any case law or statutory provision allowing such an instruction. This would be left to the discretion of the trial court who is responsible for preparing the charge. This point of error is overruled.

In point of error thirty, Appellants object to trial court's action in overruling their motion for mistrial because of a confrontation before the jury between the prosecuting attorney and an attorney for another defendant who was being tried jointly with Appellants. And, in point of error thirty-one, they complain of the court refusing to instruct the jury as follows:

> You are instructed that this case was consolidated by order of the court, that the defendants did not have the opportunity to be tried separately because of the court's order, and any statements made by any of the defense attorneys should not be attributed to or considered to be the statements of any of the other defendants' attorneys or affect any of the other defendants other than the defendant for whom the attorney was speaking unless it has been made clear that the other attorneys adopted and agreed with such statements.

Again, Appellants have not furnished us with any case law or statutory citation to justify their claim. Absent a more specific showing

how an Appellant may have been harmed, we cannot say the court abused his discretion. These points of error are overruled.

The judgments of the trial court are **affirmed as to Thomas E. Ladner and James M. Hyden.**