MARY'S OPINION HEADING 







                                                                                    NO. 12-03-00035-CR
 
IN THE COURT OF APPEALS

TWELFTH COURT OF APPEALS DISTRICT

TYLER, TEXAS
CHASE CRAIG HUDSON,                               §                 APPEAL FROM THE 
APPELLANT
 
V.                                                                         §                 COUNTY COURT AT LAW

THE STATE OF TEXAS,
APPELLEE                                                        §                 HOPKINS COUNTY, TEXAS
                                                                                                                                                            
MEMORANDUM OPINION
            Chase Craig Hudson (“Appellant”) was charged by information with the Class B
misdemeanor of False Identification as Peace Officer, a violation of Section 37.12 of the Texas Penal
Code. A jury found Appellant guilty, and the trial court assessed his punishment at 180 days of
confinement in the county jail, probated for eighteen months, and a fine of $500. Appellant presents
two issues. First, he challenges the legal sufficiency of the evidence. In his second issue, he
contends that a newspaper article read by half the jurors after they were chosen but before the
presentation of evidence exerted a prejudicial influence on the jurors and denied him a fair trial. We
affirm.
 
Background
            Micah Woolsey (“Woolsey”), the State’s primary witness, was sixteen at the time of the
offense. She lived with her mother at the Spanish Trail Apartments in Sulphur Springs. Woolsey
first saw Appellant on a midsummer evening in 2001. She and some of her friends were visiting
outside of her apartment when two boys in the group started fighting. Appellant came around the
corner of the building, said he was the police, and told them that “if we didn’t get control of it, he
was going to call for backup.” The boys stopped fighting and Appellant left after Woolsey assured
him everything was under control.
            A few nights later on August 2, 2001 at around nine thirty or ten, Woolsey saw Appellant
when he stopped his small green Ford pickup near where she and her friend, Stacey Rodriguez, were
standing near Woolsey’s apartment. The girls approached the truck closely enough to observe that
Appellant was wearing a black shirt, blue jeans, and a hat with D.P.S. on it in white letters. In his
pickup he had a scanner, a walkie talkie, and a big flashlight like the ones policemen carry. When
they asked him if he was looking for someone, he said that he was, but that he could not tell who he
was looking for because he was “undercover.” When Woolsey asked to see his badge, Appellant
responded “he couldn’t show it to us because he was undercover.” Woolsey asked him “if he was
undercover, why did he have a D.P.S. hat on.” Appellant said “he had to have some form of
identification to show he was a cop.” Woolsey testified that she had the impression he was a law
enforcement officer because he was wearing the hat. Although she never talked to Appellant again,
she saw him driving around the apartment complex.
            Woolsey’s friend, Stacey Rodriguez (“Rodriguez”), testified that Appellant wore a hat with
D.P.S. on it in big white letters. She also noticed Appellant had a scanner that he said he was using
because “he was a cop.” Rodriguez did not tell anyone about their encounter at the pickup because
Appellant “just acted like a police officer, and I didn’t suspect nothing of it.”
            Several days later, Appellant sped through the parking lot near the pool area. Ranae Kimmey
(“Kimmey”), the apartment manager, yelled at Appellant to “slow down.” Appellant did not slow
down, but went out of the parking lot. He then returned, demanding to know who had “hollered”
at him. An argument ensued. He would not give Kimmey his name, but told her he was
“undercover.” She obtained his vehicle’s license number and called the police to file a complaint
on an officer.
            Officer Jason Ricketson (“Ricketson”) of the Sulphur Springs Police Department answered
the call and conducted the investigation that led to the charge against Appellant. Ricketson testified
that in his opinion, D.P.S. stood for Department of Public Safety. He also testified that, to his
knowledge, Appellant was not a D.P.S. officer or involved in law enforcement at the city or county
level.
 
Legal Sufficiency
            In his first issue, Appellant contends that the proof is legally insufficient that he possessed
an item bearing an insignia of a law enforcement agency that identified anyone as a peace officer. 
In reviewing a legal sufficiency challenge, the appellate court examines the evidence in the light
most favorable to the verdict to determine whether any rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307,
315-16, 99 S. Ct. 2781, 2787, 61 L. Ed. 2d 560 (1979); Johnson v. State, 871 S.W.2d 183, 186 (Tex.
Crim. App. 1993). In pertinent part, the information charges that Appellant
 
did then and there possess an item, to-wit: a hat bearing an insignia of a law enforcement agency to
wit: D.P.S. that identifies a person as a peace officer; and Chase Craig Hudson while possessing the
insignia knew he was not commissioned; but presented himself as a peace officer with the Department
of Public Safety as indicated on the item.


The information alleges a violation of Texas Penal Code, section 37.12(a), which in pertinent part
reads as follows:
 
(a) A person commits an offense if:
 
(1) the person makes, provides to another person, or possesses a card, document,
badge, insignia, shoulder emblem, or other item bearing an insignia of a law
enforcement agency that identifies a person as a peace officer or a reserve law
enforcement officer; and
 
(2) the person who makes, provides, or possesses the item bearing the insignia
knows that the person so identified by the item is not commissioned as a peace
officer or reserve law enforcement officer as indicated on the item. 


Tex. Pen. Code Ann. § 37.12(a) (emphasis added). Insignia is defined as “(1) [a] badge of office,
rank, membership or nationality; emblem. 2. A distinguishing sign.” The American Heritage
Dictionary 665 (William Morris ed., 2nd College ed. 1985).
            The question here is whether the letters D.P.S. on a hat are an insignia identifying the wearer
as a peace officer. We conclude that they are. Officer Ricketson testified that it is commonly
understood that the letters D.P.S. stand for Department of Public Safety. That general understanding
is further evidenced by the testimony of the two teenage girls who told the court that they believed
Appellant was a Department of Public Safety officer because he had D.P.S. on his hat. We believe
that in Texas the letters D.P.S. are ordinarily associated in the public mind with the state law
enforcement agency just as the letters F.B.I. are understood to mean Federal Bureau of Investigation. 
And absent evidence to the contrary, a person might reasonably assume that one wearing a hat or cap
with those letters was a peace officer. It was clearly Appellant’s intent in wearing the hat to convey
that impression. That is precisely the conduct the statute was enacted to prevent. We believe,
however, that even ignoring Appellant’s representation of himself as a D.P.S. undercover agent,
there is legally sufficient evidence that the hat with D.P.S. on it in and of itself identified Appellant
as a peace officer.



            Based upon our review of the record, we conclude the evidence is legally sufficient to support
the verdict. Appellant’s first issue is overruled.
 
Mid-trial Prejudicial Outside Influence on the Jury
            In his second issue, Appellant maintains that a newspaper article read by three of the six
jurors after they were sworn constituted an “inherently prejudicial outside influence” compromising
the integrity of the verdict and denying him a fair trial.
            After the jury was chosen but before the commencement of testimony, an article concerning
the case appeared on the front page of the Sulphur Springs News–Telegram entitled, “Man accused
in fake cop case on trial Wednesday.” The article quoted the prosecutor who described the State’s
case as follows:
 
We charged that he was wearing an item of clothing with a police insignia . . . This was not like he
had on a cap or shirt with NYPD or FDNY. He wore something that indicated he was directly
affiliated with a police department.


In the article, the prosecutor went on to say that “[t]his was not a one-time thing, and this case has
the potential to grow and get worse if people are not made aware of this and he is not held
accountable.” The article also described a “third degree felony offense” of “impersonating an
officer” alleged to have been committed by Appellant for which he had not been prosecuted.

Standard of Review and Applicable Law
            “The trial judge has large discretion in ruling on the issue of prejudice resulting from the
reading by jurors of news articles concerning the trial.” Marshall v. United States, 360 U.S. 310,
312, 79 S. Ct. 1171, 1173, 3 L. Ed. 2d 1250 (1959). The determination of claims of jury prejudice
due to media attention must turn upon the special facts of each case. Ladner v. State, 868 S.W.2d
417, 423 (Tex. App.–Tyler 1993, pet. ref’d) (citing Marshall). In Ladner, a high profile case
involving mid-trial publicity and cited by the State and Appellant, this court adopted a two-step
process for determining if an individual voir dire of the jurors is required to ascertain the prejudicial
effect caused by the news coverage.
 
[T]he trial court must first look at the nature of the news material in question to determine whether it
is innately prejudicial; factors such as timing of the media coverage and its possible effects on legal
defenses are to be considered. Second, the court must ascertain the likelihood that the publicity has
in fact reached the jury.
 
Ladner, 868 S.W.2d at 423 (quoting United States v. Manzella, 782 F.2d 533, 542 (5th Cir. 1986)).
            If it appears that prejudicial publicity has reached the jury, the inquiry does not end. Other
factors may vitiate the harmful effect of the prejudicial news account or broadcast. See Andrea G.
Nadel, Annotation, Juror’s Reading Of Newspaper Account Of Trial In State Criminal Trial During
Its Progress As Ground For Mistrial, New Trial, Or Reversal, 46 ALR 4th 11 (1986) and the cases
collected therein. Chief among these factors is the finding that, although they had read the news
account, the jurors were not or would not be influenced by what they had read about the case. See
id. This is most often demonstrated by the jurors’ own denials that they had been or would be
influenced by what they had read.


 Another factor is whether the trial judge, after discovering the
jury’s exposure to prejudicial press accounts, adequately instructed the jurors that they must put aside
any impression formed from the article and decide the case solely upon the evidence admitted in
court. See id. Not all prejudicial press exposure is equally injurious. Some information may be so
toxic that there can be no realistic expectation of purging its taint. Therefore, the nature of the
information is also a factor in determining if its harmful effect is curable. See id. 
            In Ladner, the defendants moved for a mistrial because of a television newscast in which a
NAACP member said the organization would take “action” unless the defendants were convicted. 
After reviewing the broadcast, the trial court found that no further inquiry was necessary and refused
to grant a mistrial. The broadcast concerned only the political reaction to the trial, did not otherwise
touch upon the trial itself, and did not address the prior criminal trial or civil suit. This court
concluded that since the broadcast was not inherently prejudicial to the defendants and the chance
of it reaching the jurors was remote, the trial court did not abuse its discretion in denying the
defendant’s motion for mistrial. Ladner, 868 S.W.2d at 423. 
Analysis
            This case differs from Ladner and Manzella in that the news article did contain information
prejudicial to Appellant, and three of the six jurors had read the article. Therefore, under the test set
out in Manzella and followed in Ladner, the trial court was required to examine the jurors to
ascertain its likely effect upon their verdict. The trial judge in this case questioned all of the jurors
regarding their knowledge of the newspaper account. The trial judge asked the three jurors who had
read the article if they could disregard what was said in the newspaper and base their verdict solely
upon the evidence adduces at trial. All three indicated that they would. In addition to the general
instructions given before the commencement of testimony, the trial judge reiterated her admonition
to the jurors that they were to refrain from reading or listening to media accounts of the trial and that
nothing not introduced in evidence was to be considered by them in their deliberations. The
information contained in the article was not so indelibly injurious that the harm could not be cured. 
See Brown v. State, 516 S.W.2d 145, 146 (Tex. Crim. App. 1974).
            In the instant case, the trial judge’s cautionary instructions were emphatic. Although a juror’s
assertion of impartiality should be viewed with healthy skepticism, especially when elicited by the
trial judge’s leading questions, we find no reason to discredit the juror’s responses that they could
disregard what they had read and base their verdict solely on the evidence. We conclude the
procedure followed by the trial judge adequate to insure Appellant a fair trial. The trial court did not
abuse its discretion in denying Appellant’s motion for mistrial. Appellant’s second issue is
overruled.
 
Disposition
            The judgment of the trial court is affirmed.
 
                                                                                        BILL BASS 
                                                                                            Justice


Opinion delivered August 18, 2004.
Panel consisted of Worthen, C.J., Griffith, J. and DeVasto, J.


















(DO NOT PUBLISH)