Affirmed and Opinion Filed April 16, 1997



In The

# Court of Appeals
# Fifth District of Texas at Dallas

---

### No. 05-94-00841-CR

---

**JERRY DON MOYE, Appellant**

V.

**THE STATE OF TEXAS, Appellee**

---

On Appeal from the 194th District Court
Dallas County, Texas
Trial Court Cause No. F93-04886-M

---

# OPINION

Before Justices Morris, Wright, and Hankinson
Opinion By Justice Hankinson

Jerry Don Moye appeals his conviction for murder. In his first and second points of error, appellant claims the trial court erroneously admitted crime scene and autopsy photographs because the danger of unfair prejudice in admitting them substantially outweighed their probative value. In his third point of error, appellant argues the trial court erroneously refused to submit appellant's requested voluntary manslaughter jury instruction as a lesser included offense of murder. We overrule appellant's points of error and affirm

the trial court's judgment.

## FACTUAL BACKGROUND

Marsha and Jerry Don Moye married in 1986. They had two children, J.D. and Jenna. In 1990, appellant and Marsha moved to Colorado with J.D. Jenna stayed in Texas with Marsha's mother. Appellant was arrested in Colorado for theft by receiving and concealing and was sent to prison for three years. While appellant was incarcerated, Marsha and J.D. moved back to Texas.

A few months after returning to Texas, Marsha met David Haggard, the victim, and they moved in together. Although initially Marsha frequently corresponded with appellant in prison, her letters became less regular over time. In these letters, Marsha never mentioned Haggard.

In April 1993, appellant was released from prison and returned to Texas. During appellant's first weekend in Texas, Marsha told him about Haggard. During this conversation, appellant indicated that he wanted to "get back" at Haggard for being with Marsha. Later, appellant told Haggard that if he ever harmed Marsha, J.D., or Jenna, appellant would kill him. Appellant and Marsha remained legally married. By agreement, Marsha kept the children during the week and appellant kept the children on the weekends.

On July 28, 1993, Marsha, Haggard, and the two children lived in a small house in Seagoville, Texas. Haggard went to bed at approximately 10:00 p.m. that night. After Haggard went to bed, Marsha, J.D., and three of Marsha's friends went to another friend's home and remained there until 1:00 a.m. When Marsha arrived home, she saw appellant

walk out of her house. He had blood on his face. Marsha asked appellant what he was doing at her house, and he answered, "Nothing, baby, nothing." Appellant then got in his truck and drove away. When Marsha went into the bedroom, she found Haggard lying on the waterbed, dead, with his throat cut.

Deputy Sheriff Arthur Jumper was dispatched to the crime scene to collect evidence. He testified that he found several knife slashes on the bed near the pillows and that one of Haggard's legs was still under the bed covers. Jumper cursorily inspected the entire house and then took interior and exterior photos of the house, including photographs of the crime scene. At trial, Jumper described the crime scene photographs he took. He also testified that he did not find blood anywhere in the house other than in the bedroom. Another officer, Greg McKinley, interviewed witnesses and gathered more information from the crime scene. A warrant for appellant's arrest issued. Appellant fled the state and was arrested in Florida.

Dr. Karen Ross, a medical examiner, performed Haggard's autopsy. Dr. Ross testified that Haggard had multiple superficial wounds to his head and neck. She further testified that Haggard had been stabbed in the right ear canal and that his left ear had been sliced through. She also stated that Haggard suffered a "serious" neck wound comprised of two separate knife wounds. These wounds formed a ten-inch gash that occupied at least half his neck's circumference. The wound was at least one and three-quarter inches deep and extended down to the level of the spine on the right side, transecting the right internal carotid artery and the right jugular vein. Dr. Robert Williams, a dentist specializing in bite

-3-

mark evidence, testified that Haggard had six human bite marks scattered across his body.

Appellant testified in his own defense. He stated that before the offense, he suspected Haggard was abusing his children. Appellant related that J.D. said that he was scared of Haggard and that Haggard threatened to kill him because he loved his father. J.D. also told appellant that Haggard beat up Marsha and threatened to kill them all. According to appellant, Marsha told him that she was scared for the children because if she left Haggard, she believed Haggard would kill her and the children.

Appellant then offered testimony regarding the events that occurred the night Haggard died. According to appellant, at about 7:00 p.m., he and a friend went to a bar called Cowboys. They stayed at the bar drinking and shooting pool until approximately 10:00 p.m. or 11:00 p.m. when appellant's friend got into a fight and they were kicked out of the bar. Appellant testified that he drank a six-pack of Miller Lite at Cowboys. While on his way home, appellant decided that he wanted to pick up his children at Marsha's and take them home even though he had not arranged to pick them up that night.

Appellant testified that when he arrived at Marsha's house, he knocked on the door and Haggard answered. Even though Haggard did not invite appellant inside and instead asked appellant to leave, appellant entered the house. According to appellant, he asked Haggard where his children were and Haggard replied "None of your damn business." At that point, appellant yelled and again asked where his children were. Haggard replied that appellant would never see his children again and that appellant did not need to know where they were. When appellant told Haggard that he was not leaving until he got his children,

Haggard (who was five feet, eight inches tall and weighed approximately one hundred and thirty pounds) punched appellant (who is six feet, one inch tall and weighs between 185 and 200 pounds) in the jaw. Appellant then hit Haggard and knocked him down. Haggard immediately jumped up and ran toward the back bedroom. Appellant turned around, shut the front door, pulled out his pocketknife and opened the blade, and ran after Haggard. Appellant testified that he "figured" Haggard had a gun "or something" in the bedroom; therefore, he followed Haggard quickly so that Haggard would not have time to get the gun, load it, and fire it at him. Appellant testified that he never saw Haggard with a weapon either in the front hall or when he got to the back bedroom.

When appellant got to the back bedroom, he tackled Haggard from behind and they landed on the bed. Appellant could not see well because the bedroom was dark, lit only by the flickering T.V. Appellant and Haggard struggled on the bed. According to appellant, there was a lot of hitting, fighting, and scratching. Appellant was on top of Haggard, and Haggard pushed appellant's arm away, causing appellant to cut his face with his knife. Appellant recalls that Haggard bit his thumb as appellant had his hand in Haggard's face. Appellant then bit Haggard's thumb. Appellant did not recall much after that, except that he "cut" Haggard.

Appellant testified that at the time he pulled his knife on Haggard he was scared because Marsha had told him that Haggard was out to get him. He further stated that although he could have left when Haggard ran to the back bedroom, he did not leave because he thought that would give Haggard the opportunity to shoot him in the back.

-5-

## ADMISSION OF PHOTOGRAPHS

In his first and second points of error, appellant contends that the trial court erroneously admitted four crime scene photographs and ten autopsy photographs (and duplicate slides) into evidence. Appellant concedes these photographs are relevant; however, he argues that the danger of undue prejudice substantially outweighed their probative value. Thus, he contends the trial court should have excluded them under Texas Rule of Criminal Evidence 403. The State counters that: (1) the crime scene photographs are more probative than prejudicial because they are few in number, they show Haggard's condition and location immediately after the offense, they were the subject of trial testimony, and they support the State's theory that appellant did not act in self-defense; and (2) the autopsy photographs and slides were necessary to illustrate the nature and extent of Haggard's wounds and therefore are more probative than prejudicial.

Under rule 403, relevant evidence is admissible unless "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading to the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." TEX. R. CRIM. EVID. 403; *see Long v. State*, 823 S.W.2d 259, 271 (Tex. Crim. App. 1991), *cert. denied*, 505 U.S. 1224 (1992). Rule 403 favors admitting relevant evidence and presumes that relevant evidence will be more probative than prejudicial. *Long*, 823 S.W.2d at 271; *Mongtomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1991) (op. on reh'g). When the party opposing admission makes a timely objection, the trial court must balance the probative value of the evidence against the danger of unfair

prejudice. *See Long*, 823 S.W.2d at 271.

When engaging in a rule 403 balancing test, the trial court must evaluate the probative value against the risk that the photographs will have "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* at 272 (defining undue prejudice). The trial court should consider the number of offered photographs; the gruesomeness, size, and detail of the offered photographs; whether the photographs are black and white or in color; whether the photographs are close-ups; whether the body is naked or clothed; and the availability of other means of proof and circumstances unique to each individual case. *Etheridge v. State*, 903 S.W.2d 1, 20 (Tex. Crim. App. 1994), *cert. denied*, 116 S. Ct. 314 (1995); *Emery v. State*, 881 S.W.2d 702, 710 (Tex. Crim. App. 1994), *cert. denied*, 115 S. Ct. 1257 (1995). Photographs are generally admissible when verbal testimony regarding the photographed subject is admissible. *Emery*, 881 S.W.2d at 710; *Phipps v. State*, 904 S.W.2d 955, 958 (Tex. App.--Beaumont 1995, no pet.). Moreover, that the scene depicted in the photograph is gory and gruesome does not make the photographs more prejudicial than probative when the crime scene is gory and gruesome. *Shavers v. State*, 881 S.W.2d 67, 76 (Tex. App.--Dallas 1994, no pet.) (citing *Long*, 823 S.W.2d at 273).

The photographs' admissibility is therefore within the trial court's sound discretion. *See Jones v. State*, 843 S.W.2d 487, 501 (Tex. Crim. App. 1992), *cert. denied*, 507 U.S. 1035 (1993). We will reverse the trial court's decision to admit the photographs only if the decision was "outside the reasonable zone of disagreement." *Narvaiz v. State*, 840 S.W.2d

415, 429 (Tex. Crim. App. 1992), *cert. denied*, 507 U.S. 975 (1993).

## Crime Scene Photographs

In his first point of error, appellant complains that the trial court erroneously admitted the State's exhibits 33 through 36—four eight by ten color photographs of the crime scene. On the morning of the offense, Deputy Sheriff Jumper was dispatched to the crime scene to collect evidence. Part of his duties included taking interior and exterior crime scene photographs. At trial, Jumper testified that State's exhibits 27 through 38 accurately depicted the crime scene as he found it the morning of the offense. He then described the scenes depicted in objected-to exhibits 33 through 36. These exhibits show:

**State's Exhibit 33:** Haggard as Jumper initially found him–lying at the foot of the bed with his head tilted back and his throat cut; the picture shows the full length of Haggard's fully clothed body; there are splatters of blood on the wall behind Haggard's head.

**State's Exhibit 34:** a close-up of the upper part of Haggard's body taken from a different angle than exhibit 33; shows blood splatters better.

**State's Exhibit 35:** a close-up of Haggard's neck wound and head.

**State's Exhibit 36:** shows mostly blood splatters and smearings on the wall behind Haggard's head; Haggard's head is seen at the very bottom of the picture.

In the court below, appellant objected to these photographs, claiming that (1) they were unduly prejudicial, (2) the state offered them solely to inflame the jury's emotions, (3) exhibits 33, 34, and 35 are cumulative and duplicative, and (4) the State could show the blood splatters on the wall depicted in exhibit 36 without again showing Haggard. The trial court, after reviewing the photographs, admitted them.

Initially, appellant argues that although the trial performed a balancing test, it did not use the standard set out in rule 403; therefore, the trial court erred. When balancing the crime scene photographs' probative value versus the risk of prejudice, the trial court stated that "the Court is required to admit evidence of that which would be verbally testified to, absent an overwhelming prejudicial aspect of the pictures." Appellant argues that this standard equates to the test announced in *Martin v. State*, 475 S.W.2d 265 (Tex. Crim. App.), *cert. denied*, 409 U.S. 1021 (1972), *overruled on other grounds*, *Jackson v. State*, 548 S.W.2d 685 (Tex. 1977), which requires the trial court to admit photographs unless they are offered "solely" to inflame the minds of the jury. *Martin* predates the adoption of Texas Rule of Criminal Evidence 403. Rule 403 sets out a different standard of admissibility—these photographs are admissible only if their probative value is substantially outweighed by the danger of unfair prejudice. *Long*, 823 S.W.2d at 272.

The trial court's comments in the record indicate that it did a proper rule 403 balancing test. These comments presume, as does rule 403, that relevant evidence is admissible. *See Long*, 823 S.W.2d at 271; *Montgomery*, 810 S.W.2d at 389. Rule 403 indicates that to rebut this presumption the party opposing the evidence must show that the danger of unfair prejudice substantially outweighs the evidence's probative value. Here, the trial court indicated that the presumption of admissibility would be rebutted if the evidence had an "overwhelming prejudicial aspect." Wording inaccuracies like this do not render the balancing test erroneous. *See Long*, 823 S.W.2d at 272 (balancing test considering whether danger of unfair prejudice "greatly outweighed," instead of "substantially outweighed,"

probative value valid under rule 403). While the trial court used slightly different language than that supplied by rule 403, the trial court applied the conceptual framework of rule 403 to analyze the photographs' admissibility. We therefore conclude that the trial court's prejudice analysis is sound in light of rule 403.

Moreover, based on this record, we cannot say the trial court abused its discretion when it determined that the crime scene photos were more probative than prejudicial. As appellant argues, these photographs are undeniably gruesome and in color, but this offense was horribly gruesome. Gruesomeness alone, therefore, will not render the probative value of the exhibits substantially outweighed by their prejudicial effect. *Id.* at 273. Without question, these crime scene photographs occupied a pivotal, and extremely probative, role at trial.

At trial, the State offered these photographs to prove that, contrary to appellant's story, he engaged in a premeditated attempt to kill Haggard "because appellant hated [Haggard] and resented the fact that the [Haggard] lived with appellant's wife and children." Through these photographs, the State also sought to rebut appellant's testimony and prove that he never confronted Haggard in the front hall but rather secretly entered the house and attacked Haggard when he knew no one other than Haggard was home. Because the only other witness to the alleged confrontation—Haggard—is dead, the crime scene photographs are the only evidence that could rebut appellant's testimony. They show Haggard's position and location on the bed, the relationship of Haggard's body to the blood splatters on the wall, and the violence of the attack. In at least one of the photographs, the jury could

determine that Haggard's legs were still covered by the blankets on the bed, thus substantiating the State's claim that Haggard was asleep when attacked. Additionally, Jumper used these photographs when he testified about the crime scene conditions as he found them. And Dr. Irving Stone, a prosecution expert witness, testified about his conclusions regarding the nature of the struggle between appellant and Haggard based on his review of these photographs.

The State's reliance on these photographs in closing argument underscores their unique probative value. The prosecutor argued that the jury could look at exhibits 33 through 36, and especially exhibit 34, to determine if Haggard's wounds were the type that would be inflicted in a defensive struggle. The prosecutor argued that "the real evidence . . . show[s] that [appellant's] whole self-defense story is a lie anyway, that it didn't happen that way, that Haggard was asleep in his bed when he was first attacked. . . . and how do you know that this story didn't happen, that there never was any knock on the door, that there never was any Haggard getting up and letting him in . . . you look at the photographs." Under these particular circumstances, we cannot say the trial court abused its discretion in admitting these crime scene photographs. *See Phipps*, 904 S.W.2d at 958.

Nor do we conclude that exhibits 33, 34, and 35 are cumulative and thus inadmissible, as appellant contends. Jumper explained, and we can plainly see, each photograph is taken from a different angle and depicts Haggard's position and injuries differently. In addition, they were also the subject of trial testimony. These two factors counsel the conclusion that the photographs are admissible. *See Jones*, 843 S.W.2d at 501 (photos that were few in

number, depicted wounds inflicted and location and position of victim, and were subject of trial testimony were admissible under rule 403).

Finally, appellant complains that the trial court should have excluded exhibit 36 because the depicted "blood splattered wall could have been shown through a photograph taken after the body was removed." The State did not offer this photograph solely to show the blood splattered wall. Rather, the State offered it to show the relationship between Haggard's body and the blood splatters. Dr. Irving Stone, chief of the physical evidence section of the Institute of Forensic Sciences in Dallas, reviewed these photographs and testified about their importance. Based on the spatial relationship between Haggard's body and the blood splatters, Stone concluded that the head or the body of the person who endured the stabbing (Haggard) would be very close or below the level of the blood splatters. The State argues that this testimony supports its theory that Haggard was in bed when appellant killed him, rather than appellant's theory that he killed Haggard in self-defense. According to the State, this fact makes exhibit 36 more probative than prejudicial. Obviously, the trial court thought so, too. For all of these reasons, we cannot say that the trial court abused its discretion when it admitted the photographs.

We overrule appellant's first point of error.

### Autopsy Photographs

In his second point of error, appellant complains that the trial court erroneously admitted State's Exhibits 41 through 50, which are slides taken during Haggard's autopsy and photographs made from the slides. At trial, the State introduced the photographs

-12-

through Dr. Karen Ross, the Dallas County medical examiner who performed Haggard's autopsy. During her testimony, however, Ross used the slides projected for the jury rather than the eight by ten color photographs that were admitted into evidence. Appellant complains that this slide show duplicated the photographs, emphasized the gruesomeness of Haggard's injuries, and therefore was "outrageously" prejudicial. He also complains that the autopsy photographs were cumulative of the crime scene photographs and offered solely to inflame the jury's emotions.

We first turn to appellant's claim that the trial court erroneously allowed the slide show. Appellant claims the slide show was cumulative and, because the slides magnified the photographs, unduly prejudicial. Autopsy photographs can be used to illustrate and clarify a medical expert's description of injuries and to reveal the cause of death. *Ladner v. State*, 868 S.W.2d 417, 426 (Tex. App.--Tyler 1993, pet. ref'd). "[W]here pictorial evidence will help the jury to understand verbal testimony, such as the technical language used by a medical doctor in describing the injuries sustained by a victim of a crime, a trial judge does not abuse his discretion in admitting these photographs." *Id.* (citing *Harris v. State*, 661 S.W.2d 106, 107 (Tex. Crim. App. 1983)). Enlarging photographs does not necessarily make them inadmissible or unduly prejudicial, especially when the medical examiner testifies that enlargements were necessary to depict the extent of a victims's injuries accurately. *See Etheridge*, 903 S.W.2d at 21; *Ladner*, 868 S.W.2d at 427.

Here, Dr. Ross testified that all of the photographs admitted were necessary to describe in detail Haggard's injuries. She further stated that slides of the autopsy were

-13-

necessary to "fully represent" the nature of each individual wound Haggard sustained and that neither words alone nor any other type of pictures could adequately describe or detail these injuries. Dr. Ross then described in detail, using these slides, all of Haggard's wounds. The record does not reflect that the jury had before it both the slides and the photographs at the same time. Based on this record, we cannot say that the slides from which the photographs were made were inadmissible.

Nor can we say that the autopsy photographs themselves were unduly prejudicial, overly gruesome, or cumulative of the crime scene photographs, as appellant contends. Dr. Ross testified before the jury in detail as to Haggard's injuries while referring to State's Exhibits 41 through 50. The exhibits show:

**State's Exhibit 41:** a picture of the top portion of Haggard's unclothed body after it was cleaned; shows the multiple abrasions, contusions, incisions, and bite-marks scattered over the extremities as well as the trunk.

**State's Exhibit 42:** a picture of the lower portion of Haggard's unclothed body after it was cleaned, showed bite-marks on legs.

**State's Exhibit 43:** two superficial incisions on Haggard's forehead; shows ruler indicating length of one of the incisions.

**State's Exhibit 44:** a close-up of Haggard's neck wound.

**State's Exhibit 45:** shows an incise wound on the right side of the face under Haggard's ear.

**State's Exhibit 46:** shows a wound to Haggard's left ear.

**State's Exhibit 47:** shows wound on right side of victim's neck from different angle than in exhibit 45.

**State's Exhibit 48:** a close-up of a stab wound; hard to tell which part of

body.

**State's Exhibit 49:** a close-up of superficial incise wound on one of Haggard's hands.

**State's Exhibit 50:** a shot of one of Haggard's hands with a superficial incise wound.

Each autopsy photograph is different from the others and shows different wounds inflicted on Haggard. The crime scene photographs did not show these individual injuries, mainly because Haggard was clothed and the wounds could not be seen. Thus, the autopsy pictures are not cumulative of each other or of the crime scene photographs.

Nor are the autopsy photographs unduly prejudicial or overly gruesome. Most of the photographs simply show minor or superficial cuts and bites. Only exhibits 41 and 44 show Haggard's neck wound after it had been cleaned and the blood removed. Exhibit 41 is an overview picture of Haggard's entire body showing all wounds, including the neck wound. Exhibit 44 is a close-up of the neck wound. While these photos are undoubtedly gruesome, they are no more gruesome than required to show the extent of the wound. Moreover, exhibit 44 is the only photograph that illustrates the full extent of Haggard's neck wound, including its depth, and therefore it is probative of the violent nature of the act that caused Haggard's death. We cannot say that the trial court abused its discretion in admitting these photographs. We overrule appellant's second point of error.

## VOLUNTARY MANSLAUGHTER

In his third point of error, appellant complains that the trial court erroneously refused to submit a jury instruction on voluntary manslaughter as a lesser-included offense of

murder. The State contends that appellant was not entitled to a voluntary manslaughter instruction, but even if he was, the failure to submit that instruction was harmless error.

Determining whether a charge on a lesser-included offense should be submitted requires a two-step analysis. *Royster v. State*, 622 S.W.2d 442, 446 (Tex. Crim. App. 1981); *Chamberlin v. State*, 704 S.W.2d 801, 803 (Tex. App.--Dallas 1985, no pet.). First, the lesser-included offense must be included within the proof necessary to establish the offense charged. Second, some evidence must exist in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser-included offense. *Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994) (en banc) (citing *Rousseau v. State*, 855 S.W.2d 666, 681 (Tex. Crim. App.), *cert. denied*, 510 U.S. 919 (1993), and *Royster*, 622 S.W.2d at 446)); *Jones v. State*, 843 S.W.2d 92, 99 (Tex. App.--Dallas 1992, pet. ref'd). When both analytical prerequisites are satisfied, the trial court errs in refusing to submit the lesser-included offense to the jury.

Here, the first prong of this test is satisfied. At the time appellant committed this offense, a person committed voluntary manslaughter if he "cause[d] the death of an individual under circumstances that would constitute murder . . . except that he caused the death under the immediate influence of sudden passion arising from adequate cause." Act of May 28, 1973, 63d Leg., R.S., ch. 426, art. 2, § 1, 1973 Tex. Gen. Laws 1122, 1124, *amended by* Act of May 29, 1993, 73d Leg., R.S., ch. 900, § 1.01, 1993 Tex. Gen. Laws 3586, 3614 (current version at TEX. PENAL CODE ANN. § 19.02 (Vernon 1994)); *Merchant v. State*, 810 S.W.2d 305, 308, 309 (Tex. App.--Dallas 1991, pet. ref'd). Accordingly,

voluntary manslaughter is included in the proof necessary to establish murder and "is a lesser-included offense of murder." *Merchant*, 810 S.W.2d at 309 (citing *Sattiewhite v. State*, 786 S.W.2d 271, 287 (Tex. Crim. App. 1989), *cert. denied*, 498 U.S. 881 (1990)).

We now turn to the second prong of this test. If evidence from any source raises the issue of a lesser-included offense, a charge on that offense must be given. *Saunders v. State*, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992) (en banc) (citing *Ojeda v. State*, 712 S.W.2d 742, 744 (Tex. Crim. App. 1986)). In determining whether the evidence raises the requested lesser-included offense, we may not consider the credibility of the evidence or whether it conflicts with other evidence. *Saunders*, 840 S.W.2d at 391; *Lugo v. State*, 667 S.W.2d 144, 147 (Tex. Crim. App. 1984). "[R]egardless of the strength or weakness of the evidence, if any evidence raises the issue that the defendant was guilty only of the lesser offense, then the charge must be given." *Saunders*, 840 S.W.2d at 391. Keeping these standards in mind, we must determine whether any evidence exists in the record that would permit a rational jury to find appellant guilty only of voluntary manslaughter. Anything more than a scintilla of evidence will entitle appellant to the voluntary manslaughter charge. *See Bignall*, 887 S.W.2d at 23.

To require a charge on voluntary manslaughter, the record must contain some evidence that appellant acted "under the immediate influence of sudden passion arising from an adequate cause." *Merchant*, 810 S.W.2d at 309 (quoting *Cerda v. State*, 557 S.W.2d 954, 958 (Tex. Crim. App. 1977)). This analysis breaks down into two components: adequate cause and sudden passion. *Merchant*, 810 S.W.2d at 309 (citing *Brunson v. State*, 764

S.W.2d 888, 894 (Tex. App.--Austin 1989, pet. ref'd)). First, the record must show some evidence of legally adequate cause—cause that would produce anger, rage, resentment, or terror in a person of ordinary temper so that the person is incapable of cool reflection. *Merchant*, 810 S.W.2d at 309; *Brunson*, 764 S.W.2d at 894. Second, the record must show some evidence of sudden passion—an excited and agitated state of mind at the time of the killing caused by direct provocation by Haggard or someone acting with Haggard. *Merchant*, 810 S.W.2d at 309; *Brunson*, 764 S.W.2d at 894. Evidence of earlier provocation alone is not sufficient. *Hobson v. State*, 644 S.W.2d 473, 478 (Tex. Crim. App. 1983); *Merchant*, 810 S.W.2d at 310. The record must also contain evidence that the accused acted in the throes of actual, subjective passion. *Merchant*, 810 S.W.2d at 310; *Lopez v. State*, 716 S.W.2d 127, 129 (Tex. App.--El Paso 1986, pet. ref'd). But an accused does not raise the issue of voluntary manslaughter merely by stating that at the moment of acting in self-defense he feared the victim. In such circumstances, a bare claim of "fear" does not show sudden passion arising from adequate cause. *Merchant*, 810 S.W.2d at 310.

Appellant refers us to the evidence that he claims would permit a jury rationally to find that if he is guilty of murdering Haggard, he did so under the immediate influence of sudden passion arising from an adequate cause: (1) he went to Marsha's home to get his children because he was concerned for their safety; (2) he was aware of Haggard's violent reputation; (3) when he arrived and asked where the children were, Haggard belligerently told him "It's none of your damn business!" and then told him "You will never get them again, you don't need to know where they're at!"; and (4) Haggard hit appellant. Appellant

-18-

claims that "[t]his belligerent, confrontational, and assaultive behavior, combined with appellant's extreme concern for the safety of his children, produced an anger, rage, and resentment to which appellant responded without thinking. In the heat of the moment, he was incapable of cool reflection." We do not agree and reject appellant's argument that this evidence rises to the level of legally adequate cause.

Appellant's entire argument hinges on the incorrect notion that Haggard's allegedly assaultive conduct (both verbal and physical) created legally adequate cause and justifies the submission of the lesser-included offense. To the contrary, when "a defendant creates the circumstances which instigate the inflaming of that defendant's passions, particularly when a defendant is an aggressor, the precipitator of a confrontation, or attempting to commit a crime when allegedly inflamed by another's response, a charge on voluntary manslaughter is not required." *Nance v. State*, 807 S.W.2d 855, 861 (Tex. App.--Corpus Christi 1991, pet. ref'd) (appellant who killed ex-husband after intruding on his farm seeking to kidnap child, demanding armed confrontation with ex-husband, and pursuing ex-husband into house after shooting started was aggressor and voluntary manslaughter jury instruction not justified); *see Harris v. State*, 784 S.W.2d 5, 10 (Tex. Crim. App. 1989), *cert. denied*, 494 U.S. 1090 (1990); *Lincecum v. State*, 736 S.W.2d 673, 679 (Tex. Crim. App. 1987), *cert. denied*, 486 U.S. 1061 (1988); *Villegas v. State*, 791 S.W.2d 226, 239 (Tex. App.--Corpus Christi 1990, pet. ref'd)). After reviewing the record in this case, we conclude that appellant was an aggressor and instigated the confrontation with Haggard.

The record shows that appellant arrived at Marsha and Haggard's house uninvited

and unexpected at approximately midnight to retrieve his children. Appellant had not arranged to pick up his children that night, but instead claimed that he was worried for their safety based on previously-received reports of Haggard's violent tendencies and violence toward his children. Appellant's fears, raised by these reports of Haggard's abusive and violent tendencies, were based on earlier provocation and do not constitute legally adequate cause. *See Hobson*, 644 S.W.2d at 478.

The record further shows that once appellant arrived at the house, he entered without permission and stayed even after Haggard asked him to leave. Haggard responded to appellant's trespass with belligerent conduct, words, and even a punch. But appellant then struck Haggard, a much smaller man, and knocked him to the ground. At that point, Haggard ran away from appellant toward the back bedroom. Rather than leaving, as appellant admitted he had the opportunity to do, appellant slammed the front door shut and followed Haggard to the bedroom with an open knife in his hands. He then tackled Haggard, a fight ensued, and Haggard was killed. From this evidence, we conclude that appellant instigated the alleged fight with Haggard by coming to the house late at night, entering without permission, following Haggard to the bedroom with a knife in his hand, and refusing to retreat after exchanging punches with Haggard. Appellant therefore precipitated the confrontation that inflamed his emotions.

Appellant also mistakenly relies on *Merchant v. State*, 810 S.W.2d 305 (Tex. App.--Dallas 1991, pet. ref'd), to argue that Haggard's assaultive conduct gave rise to adequate cause. But *Merchant* can be distinguished, because in that case, the appellant did not

-20-

instigate or precipitate a fight that inflamed his own emotions. Accordingly, although the assaultive conduct in *Merchant* may have created legally adequate cause, Haggard's allegedly assaultive conduct will not have the same effect in this case.

Moreover, even if evidence of legally adequate cause existed in the record, appellant neither argues nor cites any record evidence indicating he acted with sudden passion. And we do not discern any sudden passion evidence. *See Gonzales v. State*, 717 S.W.2d 355, 357 (Tex. Crim. App. 1986). We look for subjective evidence of appellant's state of mind that shows he "acted in the throes of actual, subjective passion." *Merchant*, 810 S.W.2d at 310. "A 'bare claim' of fear does not demonstrate sudden passion; fear that demonstrates sudden passion must be that which commonly produces a degree of terror 'sufficient to render the mind incapable of cool reflection'." *Carillo v. State*, 889 S.W.2d 501, 503 (Tex. App.-- Houston [14th Dist.] 1994, no pet.) (quoting *Daniels v. State*, 645 S.W.2d 459, 460 (Tex. Crim. App. 1983)). The mere fact that at the moment of acting in self-defense, appellant feared Haggard is not sufficient to raise sudden passion. *See Merchant*, 810 S.W.2d at 310.

Appellant testified he was scared of Haggard at the time he pulled out his knife and followed Haggard to the back bedroom. He then amplified this comment by stating that he was afraid of Haggard's propensity to violence. He also testified that when Haggard ran to the back bedroom, appellant had "a lot of stuff" going through his mind. Appellant claims that at the time he was "under the influence for the safety of my children." Appellant admitted at trial, however, that after he entered the house he became aware that his children were not home. More importantly, evidence in the record shows that appellant was

-21-

capable of, and exercised, cool reflection at the time of the incident.

Appellant testified about his mental processes when Haggard ran to the back bedroom. He stated that he shut the front door and then followed Haggard to the back bedroom because he thought Haggard was running to the bedroom to get a gun to shoot him. He testified that he followed Haggard quickly because he did not want to give Haggard a chance to retrieve the gun, load it, and fire it at him. Finally, appellant thought about retreating but did not because he did not want to get shot in the back. This evidence does not show the requisite mental state to raise sudden passion; rather, it shows that appellant was consciously aware of danger and acted accordingly. This showing is not sufficient. *See Jones v. State*, 687 S.W.2d 425, 428 (Tex. App.--Dallas 1985, pet. ref'd) (finding no evidence of sudden passion—only a conscious awareness of danger—when defendant who was being chased by victim, saw victim reach for kitchen drawer that contained knives, surmised victim was reaching for a knife, and fatally stabbed victim before she could reach for knife). We therefore conclude that the second prong of the lesser-included offense inquiry is not satisfied and the trial court did not err when it refused to submit appellant's

requested jury instruction. We overrule appellant's third point of error.

We affirm the trial court's judgment.

DEBORAH G. HANKINSON
JUSTICE

Do Not Publish
Tex. R. App. P. 90
940841F.U05



0002673

## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

JERRY DON MOYE, Appellant

No. 05-94-00841-CR          V.

THE STATE OF TEXAS, Appellee

Appeal from the 194th District Court of Dallas County, Texas. (Tr.Ct.No. F93-04886-M).
Opinion delivered by Justice Hankinson, Justices Morris and Wright participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered April 16, 1997.

DEBORAH G. HANKINSON
JUSTICE